Vicky M. LOPEZ, Crescencio Padilla, William A. Melendez, Jesse G. Sanchez, and David Serena, Plaintiffs,

v.

MONTEREY COUNTY, CALIFORNIA, Defendant.

No. C–91–20559–RMW (EAI).

United States District Court,
N.D. California.

Dec. 20, 1994.

Order Clarifying Decision
Jan. 10, 1995.

Joaquin G. Avila, Milpitas, CA, San Francisco, CA, Barbara Y. Phillips, University of Mississippi Law School, University, MS, for plaintiff.

Douglas C. Holland, County Counsel, Salinas, CA, for defendant Monterey County.

Manuel Medeiros, Deputy Atty. Gen., Sacramento, CA, for intervenor State of Cal.

Michael W. Stamp, Pacific Grove, CA, for intervenor Michael S. Fields, Judge of the Municipal Court.

## ORDER ENJOINING ELECTIONS PENDING PRECLEARANCE OF PERMANENT PLAN EXCEPT FOR COURT–ORDERED SPECIAL ELECTION IN 1995

WHYTE, District Judge.

## I. INTRODUCTION

This is a case in which the plaintiffs challenged the implementation of six Monterey County ordinances on the ground that they were not precleared as required by the Voting Rights Act, 42 U.S.C. § 1973c. The ordinances consolidated two municipal and seven justice court districts into a single municipal court district with the judges being elected at large from the entire county. The court previously determined that the ordinances were subject to preclearance and that preclearance had not been obtained. The Coun-

ty then sought preclearance but discontinued its effort stipulating that it could not establish that the consolidation ordinances did not have the effect of denying the right to vote to Latinos as a result of the retrogressive effect that consolidation had on Latino voting strength. Pursuant to this court's order which included an injunction prohibiting an election pending adoption and preclearance of an election plan,[1] the County next attempted to secure an amendment to the California Constitution regarding the configuration of districts, so it could implement an election plan that complied with the Voting Rights Act and did not violate any provision of California law. The County was unsuccessful. The question now facing the court is what remedy, under the circumstances, is appropriate.

## II. SUMMARY OF CURRENT ISSUE BEFORE COURT AND DECISION THEREON

Plaintiffs and Monterey County urge the court to allow elections to take place under a plan that would involve maintaining the current single, county-wide district but with election areas. This plan would eliminate linkage between the judges' jurisdictional and electoral bases and would split the City of Salinas into two areas for election purposes. However, it would allow the County to continue its current administrative scheme for the county-wide operation of the municipal courts. As an alternative, plaintiffs and the County ask that the court authorize the County to implement a plan which would include more than one district and would split the City of Salinas.[2] This plan would require substantial administrative changes in the operation of the courts. The State of California and Municipal Court Judge Fields, both of whom have intervened, object to the proposals made as unnecessarily intrusive on state interests.

For the reasons set forth below, the court hereby continues its injunction prohibiting

---

1. The County has chosen not to attempt to obtain preclearance of a plan that potentially violates state law in any way without this court's permission, apparently believing that any attempt to do so would result in preclearance rejection or be futile.

2. Return to the last lower court district plan in effect before passage of the subject ordinances was conceded by plaintiffs and the County to be impractical.

Monterey County from holding elections for municipal court judges pending adoption and preclearance of a permanent plan, except the court orders that a special election be held in 1995 to protect the rights of the citizens to elect judges while a permanent legislative solution is being developed and precleared. The court-ordered special election will be held pursuant to an election area plan, specifically the "Municipal Court Division Plan" as described in the Second Stipulation presented to the court by plaintiffs and the County on January 13, 1994. The terms of the judges elected will expire on the first Monday in January 1997.

## III. BACKGROUND

Prior to 1968, Monterey County had two municipal and seven justice court districts. By ordinances enacted by the County between 1968 and 1983, those districts were consolidated so as to provide for one municipal court district with judges elected at large from the entire county. The consolidation ordinances were subject to review under Section 5 of the Voting Rights Act and, on September 6, 1991, plaintiffs herein filed this Section 5 enforcement action seeking declaratory and injunctive relief requiring the County to seek preclearance of the ordinances before enforcing them further. Pursuant to 28 U.S.C. § 2284, the case was assigned to this three-judge court. On March 31, 1993, this court found that the ordinances did, in fact, require preclearance, that such preclearance had not been obtained, and that the ordinances could not be enforced without preclearance. In response to the court's order, the County, on August 10, 1993, filed a declaratory judgment action in the United States District Court for the District of Columbia to obtain after-the-fact preclearance of the ordinances. *County of Monterey v. United States of America*, No. 93–1639 (D.D.C. filed Aug. 10, 1993). That action was subsequently dismissed upon a stipulation that "[t]he Board of Supervisors is unable to establish that the Municipal Court Judicial Court Consolidation Ordinances adopted by the County between 1968 and 1983 did not have the effect of denying the right to vote to Latinos in Monterey County due to the retrogressive effect sever-al of these ordinances had on Latino voting strength in Monterey County." Monterey County, Cal., Resolution 94–107 (March 15, 1994).

Monterey County and plaintiffs then agreed to the implementation of an "Election Area Plan" for the election of municipal court judges and requested that this court order the County to adopt the system. The Election Area Plan consisted of seven election areas which were specific geographic areas in which only the residents could vote. The areas were to be used solely for election purposes and there would remain only one county-wide municipal court district for all other purposes. The parties acknowledged that the plan might conflict with Article VI, Section 16(b) of the California Constitution, since it removed the linkage between a judge's electoral and jurisdictional bases. They asked the court to authorize the County to adopt the plan and the County stated that it would then seek preclearance. The State of California asked to intervene and objected to the issuance of an order authorizing the plan. The court, by order dated December 22, 1993, allowed the State to intervene and declined without prejudice to approve the proposed Election Area Plan because it was not satisfied that a plan necessarily had to conflict with the California Constitution in order to comply with the Voting Rights Act. Judge Michael S. Fields, a municipal court judge, was also allowed to intervene in his personal capacity.

On January 13, 1994 the County submitted a new stipulation and proposed order in response to the court's order of December 22, 1993. The new proposed plan, entitled "Municipal Court Division Plan," called for four divisions. The divisions, like the areas in the previously proposed Election Area Plan, were specific geographic areas in which only the residents could vote. The divisions were to be used solely for election purposes and not for assignment of cases, court locations, or any other purpose. Plaintiffs and the County suggested that the Division Plan did not violate the state constitution, but requested the court to approve it even if it felt otherwise. The State and Judge Fields objected to acceptance of the Division Plan on

the basis, among others, that it violated Article VI, Section 16(b) of the California Constitution, which requires that judges be elected in their counties or districts. In its order dated February 28, 1994 the court again stated that it was not satisfied that an election plan had to conflict with the California Constitution in order to meet the requirements of the Voting Rights Act and implicitly held that the Division Plan in fact did so conflict. The court further ordered that the County submit for preclearance an election plan that complied with the Voting Rights Act and all applicable provisions of the California Constitution and state law, or show cause why it could not do so.

On March 31, 1994, in a hearing to show cause, the County explained why it could not submit the requested plan for preclearance and referred to Board of Supervisors' Resolution 94–107, which made certain findings supporting the Board's conclusion that "[t]he Board of Supervisors is unable to devise or prepare any plan for the election of municipal court judges in Monterey County that does not conflict with at least one state law and still comply with the Voting Rights Act." On June 1, 1994 the court issued its order enjoining Monterey County from holding elections for municipal court judges pending adoption and preclearance of a plan for their election. The County was ordered to take the necessary steps to obtain changes in existing state law and county ordinances to effectuate such a plan. The parties were also ordered to appear on November 3, 1994 to report on their progress.

Following the court's order of June 1, 1994, the County made a good faith effort to secure passage of an amendment to the California Constitution regarding the configuration of municipal court districts in Monterey County. The efforts were unsuccessful for reasons that appear unrelated to any controversy regarding the proposed amendment. Plaintiffs and Monterey County now urge the

court to allow elections to take place under the Municipal Court Division Plan which they had proposed to the court on January 13, 1994. As an alternative, they ask that the court authorize the County to implement a plan which would include districts that split cities.

## IV. ANALYSIS

The final step for the three-judge court is to determine "what remedy is appropriate." Section 5 contemplates injunctive relief, which is by its nature equitable. Moreover, the Supreme Court has indicated that the three-judge court has some limited discretion in fashioning a remedy by directing that the court must fashion an "appropriate" remedy. *See e.g., Perkins v. Matthews,* 400 U.S. 379, 441, 91 S.Ct. 431, 441, 27 L.Ed.2d 476 (1971) (questions of appropriate remedy for district court)....

*Brooks v. State Board of Elections,* 775 F.Supp. 1470, 1482 (S.D.Ga.1989).

 Since the County did not obtain preclearance for the consolidating ordinances it enacted after 1968, this court must enjoin elections under those ordinances. The question that remains then is how, under the existing circumstances, should the court further "fashion an appropriate remedy" under its equitable powers. A return to the system that was last in effect before the adoption of the unprecleared ordinances is impractical and no party seems to seriously advocate that even as an interim solution.[3] Continuance of the injunction without any election pending implementation of a precleared system would deprive the voters of their right to elect judges. Obviously, the court cannot overlook the importance of the citizens' right to elect judges while a permanent legislative solution is being developed and precleared. A memorandum dated January 11, 1994 from the Registrar of Voters shows that seven of

---

**3.** The last lower court district plan in effect at the time Monterey County became a covered jurisdiction consisted of two municipal districts, with two municipal court judges in each such district, and seven justice court districts with one justice court judge in each such district. Monterey County, Cal., Ordinance 1347, as amended by Ordinance 1597. In addition to resolving prob-

lems associated with the fact that seven of the districts were justice court districts and the total number of municipal court judges is now ten, the districts would have to wrestle with the fact that several of the districts would be very small. This would undoubtedly result in administrative problems including frequent assignment of judges to districts other than their own.

the ten judicial offices would have been up for election in 1994 but for the preclearance problem and the court's injunction. As noted in *Wise v. Lipscomb*, 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978) (citation omitted):

> Legislative bodies should not leave their reapportionment tasks to the federal courts; but when those with legislative responsibilities do not respond, or the imminence of a state election makes it impractical for them to do so, it becomes the "unwelcome obligation" of the federal court to devise and impose a reapportionment plan pending later legislative action.

Therefore, the court concludes that its remedy must allow for an election pending the implementation of a permanent legislative solution. *See Berry v. Doles*, 438 U.S. 190, 98 S.Ct. 2692, 57 L.Ed.2d 693 (1978) (suggesting that a special election could be considered by the district court if Section 5 approval was not obtained for a voting change). The interim election plan shall call for a special election in 1995 that is not unduly intrusive on state law and policies and not unreasonably disruptive to the County's interests in effective and efficient delivery of municipal court services. Under the Supremacy Clause, the implementation of relief for a violation of the Voting Rights Act must take precedence over enforcement of state law that stands in the way of effective relief. *See Katzenbach v. Morgan*, 384 U.S. 641, 646–47, 86 S.Ct. 1717, 1721–22, 16 L.Ed.2d 828 (1966). The terms

of those elected, however, will expire on the first Monday in January 1997, so that the County understands that it must have a permanent solution in effect by the time of the next general election or it will risk being without judges.

The court is satisfied that there are only two viable alternatives for an interim, emergency election plan.[4] One is to authorize the County to implement an interim plan which includes districts that split the City of Salinas. This would require the court to "suspend" application of Article VI, Section 5 of the California Constitution in order to allow compliance with the Voting Rights Act. This approach is favored by the State and Judge Fields over the second alternative discussed below, although the State contends that there is no basis for the court to relieve the County from any of the state's constitutional restrictions.[5]

The other alternative is to permit the County to implement a temporary election plan that is predicated on the Municipal Court Division Plan such as described in the Second Stipulation submitted to the court in January 1994. Under this plan, a judge's jurisdictional and electoral bases would not be coterminous. This plan would require the "suspension" of Article VI, Section 16(b) of the California Constitution. It would also require the splitting of the City of Salinas.

The court has considered in analyzing alternatives for an interim plan the recent en

---

4. The court does not imply that the consolidation ordinances which the court found had not been precleared necessarily resulted in a voting procedure that violates Section 2 of the Voting Rights Act (42 U.S.C. § 1973(a)), i.e. that the voting procedure results in a denial of the right of any citizen to vote on account of race or color. While evidence has been offered to that effect by the stipulation between plaintiffs and defendant County, this court has not made such a finding. However, the court is reluctant to consider a single district, county-wide election plan as a temporary remedy in light of the supported stipulation that such a plan would be retrogressive in terms of Latino voting strength.

5. The State's brief is not clear as to whether the State believes that the court has no basis for relieving the County from any of the State's constitutional restrictions on a temporary basis or whether it only objects to the court's attempting to give some sort of permanent authorization

to violate state law. The court agrees with the State that any attempt to give the County approval to violate existing state law on a permanent basis is, at this time, beyond the scope of this court's function. However, temporary relief is necessary to enable elections to go forward at this time without violating the Voting Rights Act. The State's suggestion that an election with shortened terms of office coupled with periodic reports to the court would be a less drastic solution does not address the question of under what plan such an election would take place. As noted earlier, no party seems to question the County's assertion that it is not now feasible to return to the *status quo ante*. In fact, any attempted return to the districts existing in 1968, the date of the last lawful judicial district map adopted the Board of Supervisors, would result in judges being frequently and regularly assigned outside their districts.

banc decision in *Nipper v. Smith*, 39 F.3d 1494 (11th Cir.1994), in which black voters and an association of black attorneys contended that the use of at-large elections in trial court jurisdictions diluted the voting strength of the black minority in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973(a). The court found that plaintiffs had established vote dilution, but that none of the remedies sought provided an objectively reasonable and workable solution to the vote dilution and that they would actually undermine the court's ability to administer justice. *Id.* at 1547–52. The proposed remedies included alternatives of electoral subdistricts and the creation of new circuits which would contain sufficient black voters to enable them to elect a candidate of their choice.

In the present case, the court is not faced with deciding whether a voting scheme violates Section 2. It is presented with the problem of what interim solution should be implemented pending the legislative enactment of a precleared voting plan. Evidence has been offered that Latino voters have had their voting strength diluted and, therefore, a special election under an at-large system would probably preclude them from electing any judge of their choice. On the other hand, persuasive evidence has not been offered that the court's ability to administer justice would be undermined by the two alternatives under consideration. The court, however, acknowledges that ultimately an at-large system or a system different from either of the two proposed alternatives may prove, under the totality of circumstances, to be the best judicial election scheme.

The prohibition against dividing a city into more than one district is set forth in Article VI, Section 5(a) of the California Constitution which provides in part: "Each county shall be divided into municipal court and justice court districts as provided by statute, but a city may not be divided into more than one

district."[6] The State's interest in preventing the division of cities does not appear to reflect any compelling state policy. In fact, the City of San Diego has been specifically authorized to divide cities if "the Legislature determines that unusual geographic conditions warrant such division." Cal. Const. art. VI, § 5(b). However, the creation of a multidistrict plan in Monterey County would require substantial administrative changes which would necessarily include reassignment of personnel, setting up new administrative procedures and the like. Further, these changes might be in effect for only the time period preceding the adoption of a permanent precleared plan. The court, therefore, finds that while a one-time, temporary suspension of the application of the city splitting prohibition would not interfere with a compelling state interest, implementation of a temporary multidistrict municipal court district plan would significantly interfere with the County's ability to provide uninterrupted efficient and effective delivery of municipal court services.

The proposed division plan allows the County to continue administratively operating the municipal courts in the county as it currently does. The problem, of course, is that the plan involves a separation of the electoral and jurisdictional bases of municipal court judges. Article VI, Section 16 provides that "[j]udges of [municipal] courts shall be elected in their counties or districts at general elections." Therefore, this division or election area plan denies residents of the Monterey County Municipal Court District the right to vote for some of the judges in the county-wide district. At first glance, this would seem to constitute a substantial intrusion on state interests. As the State points out, historically, municipal and small claims courts have been intended to be responsive to the ordinary affairs of the citizens of their districts.[7] Several courts have noted that

---

6. California Government Code Section 71040 similarly prohibits the dividing of a city so that it lies within more than one district.

7. The State also contends that the implementation of the division plan proposed by plaintiffs would raise many questions about the authority and status of "election area" judges. These concerns seem somewhat unfounded, since the proposal only concerns the election process and does not otherwise attempt to affect the authority and status of the judges. Further, the plan is not being implemented as a legislative solution to the existing Voting Rights Act problem facing the County, but is rather being implemented by the court as an interim, emergency solution to insure the voters' right to elect municipal court judges.

linkage between electoral and jurisdictional bases is a recognized state interest: "The overwhelming preservation of linkage in states that elect their trial court judges demonstrates that district-wide elections are integral to the judicial office and not simply another electoral alternative." *League of United Latin American Citizens v. Clements,* 999 F.2d 831, 872 (5th Cir.1993); *see also Nipper v. Smith,* 39 F.3d at 1547-52.

However, on closer analysis the intrusion on state law does not seem as substantial as it initially appears. The process of municipal courts extends throughout the state, Cal.Civ. Proc.Code § 84, and, therefore, the jurisdiction of a municipal court judge extends outside the geographic limits of the judge's district. In addition, Article VI, Section 15 of the California Constitution provides that "[a] judge eligible for municipal court service may be assigned by the Chief Justice to serve on any court." This provision authorizes the Chief Justice to assign municipal court judges from one municipal court district to serve in other municipal court districts. Sometimes the Chief Justice issues "blanket assignments." As noted in the 1994 Annual Report of the Judicial Council of California:

> Blanket (within county) and reciprocal (between counties) assignments are issued each year by the Chief Justice to permit judges of one court to sit as judges of another court within their county or in a neighboring county. A total of 193 blanket assignments and 73 reciprocal assignments were issued during fiscal year 1992-93.

Judicial Council Report at 167.

These facts show that in practice the rights of nonresidents are often judged by resident judges. Also, nonresident judges are frequently assigned to other districts. Therefore, as a practical matter, linkage between a judge's electoral and jurisdictional bases cannot be considered an overwhelmingly strong public policy. The district court in *Cousin v. McWherter,* 840 F.Supp. 1210, 1220 (E.D.Tenn.1994) so recognized in holding that the use of a single, at-large district for election of voters violated the Voting Rights Act:

The Court finds that this policy underlying the practice of county wide election for judges is tenuous if a totality of circumstances test is utilized. Any voter in any number of different situations may be subjected to the jurisdiction of a judge for which they had no opportunity to vote such as a federal judge, or a judge in another county or another state. Judges routinely respond to litigants who will not have the opportunity to vote for the judge in an election. There is never a guarantee that jurisdiction and electorate will be coextensive.

The dissenting judges in *Nipper* also questioned the importance of linkage as a component of state policy. *Nipper v. Smith,* 39 F.3d at 1560. Although an election division plan as proposed will undoubtedly cause more parties to have their cases heard by judges who did not elect them, there is no strict linkage presently existing in California courts.

■ The concern of the State and Judge Fields that an election area plan may violate the Equal Protection clause of the Fourteenth Amendment seems unfounded. No case has been cited which comes to that conclusion. However, several courts have remedied violations of Section 2 of the Voting Rights Act in cases involving at-large or circuit-wide judicial election systems by ordering the use of election sub-districts that are not coterminous to the jurisdictional bases of the elected judges. *See Clark v. Roemer,* 777 F.Supp. 471 (M.D.La.1991), *appeal dismissed,* 958 F.2d 614 (5th Cir.1992) (Louisiana trial and appellate courts); *Martin v. Mabus,* 700 F.Supp. 327 (S.D.Miss.1988) (circuit, chancery, and some county court judges); and *Hunt v. Arkansas,* No. 89-406 (E.D.Ark. Nov. 7, 1991) (consent decree concerning trial courts of general jurisdiction).

The court, therefore, concludes that the Municipal Court Division Plan, as an interim plan, minimally intrudes on state interests and enables the County to maintain its current administrative operation of the municipal courts while it is working for a permanent legislative solution to its Voting Rights

Act problem.[8] The calendar for such an election is set forth in the memorandum of the Registrar of Voters to County Counsel dated October 4, 1994 (Appendix A).

■ Although a federal court's authorization of the emergency, interim use of a court-created election plan does not normally require preclearance, *see* 28 C.F.R. § 51.18(c), such preclearance is required when the covered jurisdiction submits a proposal reflecting its policy choices irrespective of what constraints have limited the choices available to it. *McDaniel v. Sanchez,* 452 U.S. 130, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981). Since the court-ordered plan here is based upon a proposal submitted by the County, the County may be statutorily required to seek preclearance of the plan, even though it is only an interim, court-directed plan. This should present no obstacle, however, as the Attorney General is apparently prepared to give expedited approval. *Amicus Curiae* Brief of the United States dated May 13, 1994, at 9 n. 10.

### V. ORDER

1. Monterey County is ordered to develop a permanent plan for the election of municipal court judges which complies with the Voting Rights Act and does not violate state law. The County shall take any steps required to obtain changes in existing state law and county ordinances.

2. Monterey County is hereby enjoined from holding elections for municipal court judges pending adoption and preclearance of a permanent plan or further order of this court.

3. Notwithstanding paragraph 2 above, the County shall implement as a court-ordered, emergency, interim plan for a special election in 1995 the election plan set forth in the Second Stipulation presented to the court by Plaintiffs and the County on January 13, 1994 with a new election calendar as set forth in the memorandum of the Registrar of Voters to the County Counsel dated October 4, 1994. The terms of office of those elected pursuant to the interim plan shall expire on the first Monday in January 1997. The court foresees that a permanent, precleared plan will be implemented in time for the next general election in 1996. The court retains jurisdiction over the implementation of the court-ordered, interim plan.

### ORDER CLARIFYING ORDER DATED DECEMBER 20, 1994

The court's order dated December 20, 1994 contemplates the normal election process for municipal court judges, except as otherwise specified in the order. Under California law, municipal court judges are elected only by majority vote, not by a simple plurality of votes cast. Therefore, the court's order requires a primary election with run-offs thereafter, if necessary.

---

8. The court does not intend by this order to pass judgment on the merits of the proposed election area plan as a potential permanent plan. That judgment is best left to legislators.

APPENDIX

# MONTEREY COUNTY

ELECTION DEPARTMENT

P.O. BOX 1848, 93902 - 1370 B SOUTH MAIN STREET, SALINAS, CALIFORNIA 93901

| | |
|---|---|
| 755-5085 | SALINAS |
| 647-7621 | MONTEREY |
| 385-8321 | KING CITY |
| 755-5485 | FAX |

**TONY ANCHUNDO**
REGISTRAR OF VOTERS

TO: DOUG HOLLAND, County Counsel

FROM: TONY ANCHUNDO, Registrar of Voters

SUBJECT: PRE-ELECTION REQUIREMENTS-Judge of the Municipal Court
 JUNE 6, 1995 ELECTION CALENDAR

DATE: October 4, 1994

| DATE (DAYS BEFORE ELECTION) | ACTIVITY (ELECTIONS CODE) |
|---|---|
| JAN 3, 95 - FEB 8, 95 (E-158 to E-118). | SIGNATURE-IN-LIEU OF FILING FEE - During this period candidates may circulate petitions in-lieu of paying full filing |
| JAN 30, 95 - FEB 8, 95 (E-127 to E-118) | DECLARATIONS OF INTENTION - During this period candidates shall pay the appropriate filing fee and file the declaration of intention to become a candidate for office. (E.C. 6554, 25301) |
| FEB 9, 95 - FEB 13, 95 (E-117 to E-113 | EXTENSION - DECLARATION OF INTENTION If an incumbent does not file, period in which any other person may file a declaration of intention and submit filing fees. (E.C. 25301 (b) |
| FEB 13, 95 - MAR 10, 95 (E-113 to E-88) | NOMINATION PERIOD - Declaration of Candidacy and Nomination Papers - Period for filing declaration of candidacy and nomination papers and deliver them for filing with the Registrar. (E.C. 6490, 6494, 6494.1, 6550, 6554, 6555) |

DOUG HOLLAND, County Counsel
October 4, 1994
Page 2

| | |
|---|---|
| **FEB 21, 95** <br> (E–108) | **SIGNATURE-IN-LIEU DEFICIENCIES** <br> Deadline for Registrar to notify <br> candidates of deficiencies in signature- <br> in-lieu petitions. (E.C. 6554, 6555b) |
| **MAR 10, 95** <br> (E-88) | **SUPPLEMENTAL SIGNATURE-IN-LIEU -** Last <br> day for candidates who filed signature- <br> in-lieu petitions to submit supplemental <br> petitions. (E.C. 6554, 6555b) |
| **MAR 11, 95 - MAR 15, 95** <br> (E-87 to E-83) | **EXTENSION OF NOMINATION PERIOD -** <br> Nomination period is extended for five <br> days if an incumbent has failed to file <br> a written and signed a declaration of <br> intention. (E.C. 25305, 25500b) |
| **MAR 15, 95** <br> (E-83) | **JUDICIAL INCUMBENT (UNOPPOSED) WRITE-IN** <br> **PETITION -** Last day to file a petition (100 qualified si <br> required) indicating that a write-in campaign will be <br> conducted in which only the incumbent has fil <br> nomination papers. (E.C. 25304) |
| **APR 10, 95 - MAY 23, 95** <br> (E-57 TO E-14) | **WRITE-IN CANDIDACY/NOMINATION PERIOD -** <br> During this period, all write-in <br> candidates must file their statement <br> of write-in candidacy (E.C. 7300-7304) |