LOPEZ ET AL. *v.* MONTEREY COUNTY, CALIFORNIA, ET AL.

No. 95–1201.  Argued October 8, 1996—Decided November 6, 1996

*Joaquin G. Avila* argued the cause for appellants. With him on the briefs were *Robert Rubin, Anthony Chavez, Antonia Hernández,* and *Richard M. Pearl.*

*Alan Jenkins* argued the cause for the United States as *amicus curiae* urging reversal. With him on the briefs were *Solicitor General Days, Assistant Attorney General Patrick, Deputy Solicitor General Bender, Steven H. Rosenbaum,* and *Eileen Penner.*

*Daniel G. Stone,* Deputy Attorney General of California, argued the cause for appellees. With him on the brief for state appellees were *Daniel E. Lungren,* Attorney General, *Floyd D. Shimomura,* Senior Assistant Attorney General, and *Linda A. Cabatic,* Supervising Deputy Attorney General.*

JUSTICE O'CONNOR delivered the opinion of the Court.

This appeal presents a challenge to an order by a three-judge District Court for the Northern District of California that authorized Monterey County to conduct judicial elections under an election plan that has not received federal approval pursuant to § 5 of the Voting Rights Act.

I

The State of California has 58 counties, one of which is Monterey County (hereinafter County). In 1971, the Attorney General designated the County a covered jurisdiction under § 4(b) of the Voting Rights Act of 1965, 79 Stat. 438, as amended, 42 U. S. C. § 1973b(b). 36 Fed. Reg. 5809 (1971); see 28 CFR pt. 51, App. (1995). As a result, the County became subject to the federal preclearance requirements set forth in § 5 of the Voting Rights Act, 42 U. S. C. § 1973c.

---

*Sidney S. Rosdeitcher, Paul C. Saunders, Norman Redlich, Barbara R. Arnwine, Thomas J. Henderson, Brenda Wright, Samuel L. Walters, Laughlin McDonald, Neil Bradley, Steven R. Shapiro, Elaine R. Jones, Norman J. Chachkin,* and *Jacqueline A. Berrien* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

*Sharon L. Browne* and *Deborah J. La Fetra* filed a brief for the Pacific Legal Foundation as *amicus curiae* urging affirmance.

*Barbara McDowell* and *Elwood G. Lui* filed a brief for the California Judges Association as *amicus curiae.*

Section 5 governs changes in voting procedures, with the purpose of preventing jurisdictions covered by its requirements from enacting or seeking to administer voting changes that have a discriminatory purpose or effect. As a jurisdiction covered by § 5, Monterey County must obtain federal preclearance—either administrative or judicial—of any voting practice different from the practices in effect on November 1, 1968. To obtain administrative preclearance of a changed voting practice, a covered jurisdiction submits the enactment to the Attorney General of the United States. If the Attorney General does not formally object to the new procedure within 60 days of submission, the jurisdiction may enforce the legislation. A covered jurisdiction may also obtain judicial preclearance—either directly or after the Attorney General has objected to the voting change—by securing in the United States District Court for the District of Columbia a declaratory judgment that the new practice "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color . . . ." *Ibid.*

On November 1, 1968, the County had nine inferior court districts. Two of these districts were municipal court districts, each served by two judges, and the other seven were justice court districts, each served by a single judge. Both municipal and justice courts were trial courts of limited jurisdiction. Municipal courts served districts with populations exceeding 40,000, and justice courts served those districts with smaller populations. The justice courts differed from the municipal courts in other respects. They were not courts of record and were served by judges who often worked part time and did not have to be members of the bar. Comment, Trial Court Consolidation in California, 21 UCLA L. Rev. 1081, 1086 (1974). (On January 1, 1990, however, a state constitutional amendment specified that all courts, including justice courts, were courts of record. Cal. Const.,

Art. VI, § 1 (1988). A few years later, California voters eliminated justice courts altogether. Art. VI, §§ 1, 5(b).)

Each of the municipal and justice courts operated separately and independently. Judges for each court were elected at large by the voters of their respective districts, and they served only the judicial district in which they were elected. The municipal and justice court districts varied widely in population and judicial workloads. For example, a 1972 survey showed that the Monterey-Carmel Municipal Court District had a population of 106,700, with more than enough work for two full-time judges. By contrast, the San Ardo Justice Court District had a population of 3,500, with a caseload that required less than a quarter of one judge's time.

Between 1972 and 1983, the County adopted six ordinances, which ultimately merged the seven justice court districts and the two municipal court districts into a single, countywide municipal court, served by nine judges whom County residents elected at large. (At present, 10 judges serve on the municipal court.) Each judge was elected to serve for a term of six years. Judicial elections were conducted under various interim schemes in 1974, 1976, 1978, and 1982. Additionally, the County conducted at-large, countywide judicial elections in 1986, 1988, and 1990.

The County's reorganization of its inferior court system took place against a backdrop of state laws governing the general administration and organization of state courts. State law authorizes a county board of supervisors, "[a]s public convenience requires, . . . [to] divide the county into judicial districts for the purpose of electing judges . . . ." Cal. Govt. Code Ann. § 71040 (West 1976). The board also "may change district boundaries and create other districts." *Ibid.*; see also Cal. Govt. Code Ann. § 25200 (West 1988) ("The board of supervisors may divide the county into election . . . and other districts required by law, change their boundaries, and create other districts, as convenience re-

quires"). A county's judicial election scheme must comply with several state constitutional and statutory requirements. Municipal court districts must include at least 40,000 residents, Cal. Const., Art. VI, § 5(a); cities may not be split into more than one judicial district, *ibid.*; Cal. Govt. Code Ann. § 71040 (West 1976); municipal court judges must be residents of the judicial district to which they are elected or appointed, § 71140; and, according to the State, judges' jurisdictional and electoral bases must be coextensive, Cal. Const., Art. VI, § 16(b); *Koski* v. *James*, 47 Cal. App. 3d 349, 354, 120 Cal. Rptr. 754, 758 (1975).

In addition to these generally applicable laws, the state legislature has enacted various pieces of legislation directed at the judicial systems of particular California counties, including laws aimed specifically at Monterey County's judicial system. Cal. Govt. Code Ann., Tit. 8, ch. 10 (West 1993). Some of these laws have reflected changes in the County's judicial districts resulting from the consolidation process.* The State has also enacted legislation dealing with the administration of the County's judicial system, such as appoint-

---

*See, *e. g.*, 1953 Cal. Stats., ch. 206, § 2 ("This article applies to the municipal court established in a district embracing the Cities of Carmel and Monterey"); 1975 Cal. Stats., ch. 966, § 2 ("This article applies only to municipal courts established in . . . [a] district embracing the Cities of Monterey, Carmel, Seaside, Sand City, and Del Rey Oaks designated as the Monterey-Carmel Judicial District; [and a] district embracing the City of Salinas designated as the Salinas Judicial District"); 1977 Cal. Stats., ch. 995, § 1 ("This article applies to all of the municipal courts established in the County of Monterey, which are in judicial districts entitled as follows: the Monterey Peninsula Judicial District, the Salinas Judicial District, and the North Monterey County Judicial District"); 1979 Cal. Stats., ch. 694, § 2 ("There is in the County of Monterey, on and after the effective date of this section, a single municipal court district which embraces the former Salinas Judicial District, Monterey Peninsula Judicial District and North Monterey County Judicial District"); 1989 Cal. Stats., ch. 608, § 1 (codified at Cal. Govt. Code Ann. § 73560 (West 1993)) ("This article applies to the Monterey County Municipal Court District, which encompasses the entire County of Monterey").

ment and compensation of court personnel. Cal. Govt. Code Ann. §§ 73564–73569 (West 1993).

Although it was subject to § 5 preclearance requirements, the County did not submit any of the consolidation ordinances for federal preclearance under § 5. The State, however, in 1983 submitted for administrative preclearance a state law, 1983 Cal. Stats., ch. 1249, that mentioned Monterey County's prospective consolidation of the last two justice court districts with the remaining municipal court district. The Department of Justice requested additional information concerning this aspect of the state legislation. In its response, the State included the last of the County's six consolidation ordinances, which was adopted in 1983. The Attorney General interposed no objection to the 1983 state law. The State's submission may well have served to preclear the 1983 county ordinance. See 28 CFR § 51.14(2) (1981); 28 CFR § 51.15(a) (1987). The United States points out, however, that the 1983 submission to the Department of Justice did not identify or describe any of the County's previous consolidation ordinances. The State does not contest this point. Thus, under our precedent, these previous consolidation ordinances do not appear to have received federal preclearance approval. *Clark* v. *Roemer,* 500 U. S. 646, 657–658 (1991); *McCain* v. *Lybrand,* 465 U. S. 236, 249 (1984).

On September 6, 1991, appellants, five Hispanic voters residing in the County, sued the County in the United States District Court for the Northern District of California, alleging that the County had violated § 5 by failing to obtain federal preclearance of the six judicial district consolidation ordinances it had adopted between 1972 and 1983. They raised no claim under § 2 of the Voting Rights Act or constitutional challenge. A three-judge District Court was convened. On March 31, 1993, the District Court ruled that the challenged ordinances were election changes subject to § 5 and consequently unenforceable without federal preclearance. The District Court directed the County to submit the

ordinances to federal officials for preclearance. It also denied the County's motion to join the State as an indispensable party under Federal Rule of Civil Procedure 19(b), finding that the State had no legally protected interest in the outcome of the action.

In August 1993, the County filed a declaratory judgment action in the United States District Court for the District of Columbia, seeking judicial preclearance of the challenged ordinances. Appellants intervened. But before that court made any findings, the County voluntarily dismissed its action, without prejudice. The County and appellants subsequently stipulated that the County was " 'unable to establish that the [consolidation ordinances] adopted by the County between 1968 and 1983 did not have the effect of denying the right to vote to Latinos in Monterey County due to the retrogressive effect several of these ordinances had on Latino voting strength . . . .' " 871 F. Supp. 1254, 1256 (N. D. Cal. 1994). The parties thereupon returned to the three-judge District Court, and several years of litigation ensued.

In essence, the County and appellants ceased to litigate the case as adversaries. Instead, they embarked on a joint attempt, opposed by the State and others as intervenors, to persuade the District Court to order a judicial election plan they viewed as less retrogressive than an at-large, countywide election scheme. In late 1993 and early 1994, the County and appellants jointly proposed two plans to the District Court. Each plan divided the County into different election areas, with judges from each area to serve on the countywide municipal court. The State objected to these schemes on the ground that they contravened California law, including the constitutional requirements that a judge's jurisdictional and electoral bases be coextensive, Cal. Const., Art. VI, § 16(b), and that cities not be split into more than one judicial district, Art. VI, § 5(a). Appellants and the County acknowledged these conflicts, but asked the District

Court to suspend operation of these state constitutional provisions in the County.

For some time, the District Court was reluctant to implement either of the proposed plans, ruling that it was "not satisfied that a plan necessarily ha[s] to conflict with [Article VI, § 16(b) in order to meet the requirements of] the Voting Rights Act." 871 F. Supp., at 1256. Finally, the County and appellants filed with the District Court a stipulation that the County could not " 'devise or prepare any plan for the election of municipal court judges in Monterey County that [did] not conflict with at least one state law and still compl[ied] with the Voting Rights Act.' " *Id.*, at 1257. The parties supported the stipulation with information on County demographics, the presence of politically cohesive Hispanic communities and Anglo bloc voting, and a legacy of discrimination that had affected Hispanic citizens' right to vote. They also set forth a number of potential election plans that they believed complied with § 5, all of which violated some aspect of state law.

In June 1994, the District Court decided to give appellants, the County, the State, and the United States, which had at this point weighed in as *amicus curiae*, another chance to develop a workable solution. It enjoined the upcoming 1994 elections. It directed the County to attempt to obtain changes in state law that would permit the implementation of a judicial election plan that complied with § 5 requirements. It asked the State to assist the County in creating an acceptable judicial election plan. Nevertheless, in late 1994, the parties were back in court, still without a satisfactory plan. The County had sought amendments to the State Constitution and statutes, but was unsuccessful.

In a December 20, 1994, order, the District Court concluded that it had to devise a remedy that would permit judicial elections to take place, pending implementation of a permanent, federally precleared voting plan. Otherwise, voters would be deprived of their right to elect judges. The

District Court recognized that neither appellants nor the County thought feasible a return to the election scheme in effect on November 1, 1968. Instead, it decided to adopt one of the plans the County and appellants previously had proposed. Under this scheme, the County was divided into four election districts. Voters in three of the districts, in which Hispanics constituted a majority, would each elect one judge. Voters in the fourth district would elect the other seven judges. Judges elected under the plan would serve for 18-month terms, until January 1997. All 10 judges would serve on the countywide municipal court. The District Court acknowledged that the interim plan was inconsistent with state law, but reasoned that the intrusion on state interests was minimal. The County submitted the interim plan to the Attorney General for preclearance, and it was precleared on March 6, 1995. In a special election conducted on June 6, 1995, seven judges were elected. (Apparently, terms of three of the judges holding seats in the seven-member election district had not expired by June 1995.)

Shortly after the June 1995 special election, this Court issued its decision in *Miller* v. *Johnson*, 515 U. S. 900 (1995), which prompted the three-judge District Court to reconsider the soundness of its interim election plan. *Miller*, ruled the District Court, cast "substantial doubt" on the constitutionality of its previous order, "as that plan used race as a significant factor in dividing the County into election areas." App. 167. Without ruling that the interim plan was in fact unconstitutional, the District Court decided to change course. It denied the County's request to extend the terms of judges elected in the 1995 special election, concerned that such an extension would be "inappropriate" in light of the possible constitutional infirmity of the interim plan. A return to the judicial election system in existence before the adoption of the consolidation ordinances was not "legal, feasible or desired." *Ibid.* In the District Court's

view, its only option was to order the County to conduct an at-large, countywide judicial election in March 1996, while enjoining future elections pending preclearance of a permanent plan. Judges elected in 1996 would serve for the usual 6-year terms. The District Court also joined the State as an indispensable party, based on the State's argument that the County was doing nothing more than administering a state statute that required countywide elections, rather than administering its own county ordinance. Thus, in essence, four years after the filing of the complaint in this case, the District Court ordered the County to hold elections under the very same scheme that appellants originally challenged under § 5 as unprecleared.

On January 22, 1996, appellants filed an emergency application in this Court to enjoin the 1996 elections pending appeal. We granted the application on February 1, 516 U. S. 1104 (1996), and noted probable jurisdiction on April 1, 517 U. S. 1118 (1996).

## II

## A

Section 5 of the Voting Rights Act applies whenever a covered jurisdiction "enact[s] or seek[s] to administer any . . . standard, practice, or procedure" different from that in force on the date of § 5 coverage. As a threshold matter, the State contends that, although the County perhaps should have submitted the consolidation ordinances to federal authorities before implementing them, intervening changes in California law have transformed the County's judicial election scheme into a state plan. Therefore, asserts the State, the County is not administering County consolidation ordinances in conducting municipal court elections, but is merely implementing California law, for which § 5 preclearance is not needed. The District Court was "not persuaded" by this argument, but ruled that the State could continue to seek to show that the County was merely administering California law. See

Cal. Govt. Code Ann. § 71040 (West 1976); see also Cal. Govt. Code Ann. § 25200 (West 1988). We leave this issue about the scope of § 5 to the District Court to resolve on remand.

The State raises other threshold issues that the District Court did not have the opportunity to address. The State contends that appellants' suit was barred by laches; that it is constitutionally improper to designate the County a covered jurisdiction under § 5; and that the consolidation ordinances did not alter a voting "standard, practice, or procedure" subject to § 5 preclearance. We express no view on these claims, leaving it to the District Court to decide them in the first instance.

## B

A jurisdiction subject to § 5's requirements must obtain either judicial or administrative preclearance before implementing a voting change. No new voting practice is enforceable unless the covered jurisdiction has succeeded in obtaining preclearance. *Clark* v. *Roemer*, 500 U. S., at 652–653; *McDaniel* v. *Sanchez*, 452 U. S. 130, 137 (1981); *Connor* v. *Waller*, 421 U. S. 656 (1975) *(per curiam)*. If a voting change subject to § 5 has not been precleared, § 5 plaintiffs are entitled to an injunction prohibiting implementation of the change. *Clark* v. *Roemer, supra,* at 652–653 (citing *Allen* v. *State Bd. of Elections,* 393 U. S. 544, 572 (1969)). The District Court's order that the County conduct elections under the unprecleared, at-large judicial election plan conflicts with these principles and with our decision in *Clark* v. *Roemer, supra.*

*Clark* concerned the propriety of a three-judge District Court's refusal to enjoin elections under an unprecleared Louisiana judicial election plan. There, Louisiana had not submitted for preclearance a number of statutory and constitutional voting changes relating to elections of state judges, many of which were adopted in the late 1960's and 1970's. *Id.,* at 649. The District Court nonetheless permitted elections to go forward, with the winners allowed to take office

if Louisiana filed a judicial preclearance action within 90 days. *Id.*, at 651. We held that the District Court erred in authorizing these elections in the absence of preclearance, pointing out that although Louisiana had been aware for at least three years that the judgeships were not precleared, it had still failed to file for judicial preclearance. *Id.*, at 655.

We acknowledged in *Clark* that earlier decisions such as *Perkins* v. *Matthews*, 400 U. S. 379 (1971), and *Berry* v. *Doles*, 438 U. S. 190 (1978) *(per curiam)*, held that where a covered jurisdiction had already conducted elections under an unprecleared plan, it might be appropriate for the district court to afford local officials an opportunity to seek federal approval before ordering a new election. 500 U. S., at 654. But those cases raised an issue different from the one in *Clark*. In *Perkins* and *Berry*, the District Courts confronted the question whether to set aside illegal elections that had already taken place. By contrast, the District Court in *Clark* had to decide whether to allow illegal elections to go forward in the first place. In this situation, "§ 5's prohibition against implementation of unprecleared changes required the District Court to enjoin the election." 500 U. S., at 654.

The District Court faced fundamentally the same problem here as in *Clark*. The County did not preclear the ordinances as required by § 5. For several years, the County had been on notice that its electoral changes were subject to § 5's preclearance requirements, yet it never obtained judicial or administrative preclearance of the consolidation ordinances. In *Clark*, we left open the question whether a district court may ever deny a § 5 plaintiff's motion for an injunction and allow a covered jurisdiction to conduct an election under an unprecleared voting plan. We suggested that "[a]n extreme circumstance might be present if a seat's unprecleared status is not drawn to the attention of the [covered jurisdiction] until the eve of the election and there are equitable principles that justify allowing the election to pro-

ceed." *Id.*, at 654–655. We found no such exigency to exist in *Clark*, and we find none here.

The State contends that there is a difference between a district court's failing to enjoin an unprecleared election scheme—the situation in *Clark*—and its ordering, pursuant to its equitable remedial authority, an election under an unprecleared plan. Regardless whether this distinction is meaningful, it does not advance the argument that the County's judicial elections may be held without § 5 preclearance. We have recognized, at least in cases raising claims under the Fourteenth Amendment, that § 5 preclearance requirements may not apply where a district court independently crafts a remedial electoral plan. *McDaniel* v. *Sanchez, supra,* 148–150 (quoting S. Rep. No. 94–295, pp. 18–19 (1975)). But where a court adopts a proposal "reflecting the policy choices . . . of the people [in a covered jurisdiction] . . . the preclearance requirement of the Voting Rights Act is applicable." 452 U. S., at 153. The at-large, countywide system under which the District Court ordered the County to conduct elections undoubtedly "reflect[ed] the policy choices" of the County; it was the same system that the County had adopted in the first place. It was, therefore, error for the District Court to order elections under that system before it had been precleared by either the Attorney General or the United States District Court for the District of Columbia.

We appreciate the predicament that the District Court faced. The County did not submit the consolidation ordinances for preclearance when they were adopted many years ago, and the District Court concluded that changes have occurred in the intervening years that make unrealistic a return to the judicial election plan of 1968, now nearly 30 years old. Since there may be no practical way to go back to the 1968 plan, simply enjoining the elections would leave the County without a judicial election system. The County and appellants seem unable to fashion an election plan that does

not contravene the California Constitution, and the State has vigorously opposed each of the parties' proposals as violative of state law.

These complications do not, however, change the basic nature of the § 5 preclearance process. Congress designed the preclearance procedure "to forestall the danger that local decisions to modify voting practices will impair minority access to the electoral process." *McDaniel,* 452 U. S., at 149 (footnote omitted). Congress chose to accomplish this purpose by giving exclusive authority to pass on the discriminatory effect or purpose of an election change to the Attorney General and to the District Court for the District of Columbia. As we explained in *McDaniel,* "[b]ecause a large number of voting changes must necessarily undergo the preclearance process, centralized review enhances the likelihood that recurring problems will be resolved in a consistent and expeditious way." *Id.,* at 151 (footnote omitted). Once a covered jurisdiction has complied with these preclearance requirements, § 5 provides no further remedy. *Allen* v. *State Bd. of Elections,* 393 U. S., at 549–550.

This congressional choice in favor of specialized review necessarily constrains the role of the three-judge district court. On a complaint alleging failure to preclear election changes under § 5, that court lacks authority to consider the discriminatory purpose or nature of the changes. *Perkins* v. *Matthews, supra,* at 385 ("What is foreclosed to such district court is what Congress expressly reserved for consideration by the District Court for the District of Columbia or the Attorney General—the determination whether a covered change does or does not have the purpose or effect 'of denying or abridging the right to vote on account of race or color'"). The three-judge district court may determine only whether § 5 covers a contested change, whether § 5's approval requirements were satisfied, and if the requirements were not satisfied, what temporary remedy, if any, is appropriate. See *City of Lockhart* v. *United States,* 460 U. S. 125,

129, n. 3 (1983); *United States* v. *Board of Supervisors of Warren Cty.*, 429 U. S. 642, 645–647 (1977) *(per curiam); Perkins, supra*, at 385; *Allen, supra*, at 558–559. The goal of a three-judge district court facing a § 5 challenge must be to ensure that the covered jurisdiction submits its election plan to the appropriate federal authorities for preclearance as expeditiously as possible.

In this case, nearly five years after appellants brought their challenge, neither the Attorney General nor the District Court for the District of Columbia has yet made any findings regarding the retrogressive effect—or lack thereof—of the consolidation ordinances adopted between 1972 and 1983. The County dismissed its declaratory judgment action before the District Court for the District of Columbia made any findings, and it has never submitted the consolidation ordinances to the Attorney General for review. Although the District Court initially ordered the County to obtain preclearance of the ordinances, when the County failed to follow through, the District Court did not enforce its order.

The District Court itself holds some responsibility for protracting this litigation. Because of its concern that the judicial election plans proposed by the County and appellants unnecessarily conflicted with California law, the District Court several times ordered the parties to submit to it an election plan that complied both with § 5's substantive requirements and with state law, before the County submitted the plan to federal officials. In so doing, it interposed itself into the § 5 approval process in a way that the statute does not contemplate. Cf. *Upham* v. *Seamon*, 456 U. S. 37, 42–43 (1982) *(per curiam); United States* v. *Board of Supervisors of Warren Cty., supra*, at 645–647; *Perkins*, 400 U. S., at 385. In their briefs, both parties raise detailed arguments regarding the effect of the consolidation ordinances on the County's minority voters, but § 5 requires either the Attorney General or the District Court for the District of Columbia to resolve

in the first instance whether the consolidated municipal court system is retrogressive compared to the system existing in 1968.

The County has not discharged its obligation to submit its voting changes to either of the forums designated by Congress. The requirement of federal scrutiny should be satisfied without further delay. See *Berry* v. *Doles,* 438 U. S., at 192. The State appears willing to assist the County in pursuing the issue before either the Attorney General or the District Court for the District of Columbia, and its effort will doubtless be of assistance.

The judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*