LULAC OF TEXAS, Plaintiff,

v.

STATE OF TEXAS, Defendant.

No. CIV. SA-96-930.

United States District Court,
W.D. Texas,
San Antonio Division.

March 3, 1998.

**720**

Before BENAVIDES, Circuit Judge, and SUTTLE and SPARKS, District Judges:

## ORDER

BENAVIDES, Circuit Judge:

This matter is before this three-judge district court on defendant's motion to dismiss, filed September 9, 1996, and plaintiff's motion for a preliminary injunction, filed November 14, 1997. For the reasons set forth below, defendant's motion to dismiss is DENIED, and plaintiff's motion for a preliminary injunction is GRANTED in part and DENIED in part. The State of Texas is hereby ENJOINED from enforcing the election law resulting from the decision of the Texas Supreme Court in *The State of Texas ex rel. Karen Angelini v. The Honorable Phil Hardberger*, 932 S.W.2d 489 (Tex.1996), until it receives preclearance of the resulting law from the United States Attorney General or from the United States District Court for the District of Columbia. Until such preclearance is received, or until the State enacts a superseding statute that has been precleared, judicial vacancies must be filled in accordance with the procedures set forth in *Texas Democratic Executive Committee v. Rains*, 756 S.W.2d 306 (Tex.1988), subsequently codified as Texas Election Code § 201.023, and precleared by the United States Attorney General in 1989.

### Background

In 1996, the Honorable Phil Hardberger, an Associate Justice of the Court of Appeals for the Fourth Judicial District, who was elected to that position in 1994 for a term that would expire on December 31, 2000, became a candidate for the office of Chief Justice of that same court. Because he had no opposition in the November 5, 1996 general election, Justice Hardberger's candidacy virtually entitled him to take office as Chief Justice on January 1, 1997. Consequently, on June 20, 1996, Justice Hardberger tendered his written notice of resignation, to be effective January 1, 1997, from his office of Associate Justice to Texas Governor George W. Bush. In a letter dated July 15, 1996, Alberto R. Gonzales, General Counsel to Governor Bush, advised Justice Hardberger that Governor Bush had determined that his resignation, and Governor Bush's subsequent acceptance of that resignation, had created an immediate vacancy on the Fourth Court of Appeals. Governor Bush then appointed Karen Angelini to replace Justice Hardberger. Justice Hardberger, however, refused to vacate his office. Consequently, on July 16, 1996, the State of Texas, on the relation of Ms. Angelini, filed a petition for an emergency writ of quo warranto with the Texas Supreme Court.[1] By order dated July 18, 1996, the Texas Supreme Court set the case for a hearing on August 13, 1996.

On July 30, 1996, LULAC filed a complaint in this court pursuant to Section 5 of the Voting Rights Act of 1965 ("VRA"), as amended, 42 U.S.C. § 1973c, seeking, *inter alia,* an injunction enjoining the State of Texas and Governor Bush from "circumventing the electoral procedures for filling the vacancy of the position of Associate Justice to the Texas Court of Appeals for the Fourth District." On July 31, 1996, the State moved to dismiss LULAC's complaint for lack of standing and/or for failure to state a claim under § 5 of the VRA. On August 6, 1996, the district court, sitting as a single-judge court, granted the State's motion and dismissed LULAC's complaint without prejudice to refiling after the Texas Supreme Court issued its decision in the quo warranto proceeding.

On August 30, 1996, the Texas Supreme Court issued that opinion. *See State ex rel. Angelini v. Hardberger*, 932 S.W.2d 489 (1996). In the opinion, the Texas Supreme Court denied the writ of quo warranto, finding that § 201.023 of the Texas Election Code could not be read to oust Justice Hardberger from office before January 1, 1997, the date on which he actually intended to

---

**1.** "A writ of quo warranto is an extraordinary remedy available to determine disputed questions about the proper person to hold a public office and exercise its functions." *Hardberger,* 932 S.W.2d at 490.

vacate his office. The Texas Supreme Court further held, however, contrary to existing case law, *see Texas Democratic Exec. Comm. v. Rains,* 756 S.W.2d 306 (Tex.1988), that § 201.023 also could not be read to trigger an election in November 1996 for the purpose of electing Justice Hardberger's interim successor. Instead, the court held that a vacancy would not exist, for both appointment and election purposes, until January 1, 1997, at which point Governor Bush could then appoint an interim successor, who would serve until the next succeeding general election, which is scheduled for November 1998.

On September 4, 1996, LULAC filed the instant complaint pursuant to § 5 of the VRA. In its complaint, LULAC sought a declaratory judgment that the decision of the Texas Supreme Court in *Hardberger* resulted in the replacement of an elected position with an appointed position and therefore constituted a change affecting voting under § 5 of the VRA. LULAC also sought an order enjoining the State and its officers from enforcing the election law resulting from the Texas Supreme Court's decision in *Hardberger* without first obtaining preclearance under § 5 of the VRA. To that end, LULAC filed a motion for a temporary restraining order in which it sought, *inter alia,* an order prohibiting the State and its officers from removing the party nominees for Justice Hardberger's Associate Justice position from the ballot for the November 1996 general election until the law resulting from *Hardberger* was precleared.

On September 9, 1996, the State filed another motion to dismiss, again asserting that LULAC lacked standing, and, in the alternative, that the decision of the Texas Supreme Court was not subject to the preclearance requirements of § 5. By order dated September 11, 1996, this court, sitting as a single-judge court, granted the State's motion to

dismiss, finding that LULAC had failed to show that the order issued by the Texas Supreme Court in *Hardberger* constituted a change affecting voting under § 5 of the VRA. LULAC timely filed a notice of appeal.

Meanwhile, the November 1996 elections occurred and no election was held to fill the impending vacancy in Justice Hardberger's Associate Justice office. On January 1, 1997, Justice Hardberger resigned from his position as Associate Justice and assumed the office of Chief Justice. On that same day, Governor Bush appointed Karen Angelini to fill the vacancy resulting from Justice Hardberger's resignation.

On appeal, the Fifth Circuit reversed and remanded, finding that the district court should not have dismissed on its own LULAC's complaint as being "wholly insubstantial"; instead, the court of appeals held that the district court should have requested the appointment of a three-judge panel to hear LULAC's complaint. *LULAC of Texas v. State of Texas,* 113 F.3d 53 (5th Cir.1997). On July 30, 1997, the Fifth Circuit's mandate issued. By order dated August 12, 1997, this three-judge panel was convened. On November 14, 1997, the court heard arguments on the State's motion to dismiss. By agreement of the parties, the court also heard arguments on LULAC's motion for a preliminary injunction, despite the fact that it was filed that same day.[2] On December 1, 1997, the State filed its written response to LULAC's motion for a preliminary injunction.

### The Role of This Court Under Section 5 of the VRA

■ Section 5 of the VRA prohibits a covered jurisdiction from implementing a voting change "unless and until" it obtains either judicial or administrative preclearance. 42 U.S.C. § 1973c.[3] "Congress designed the

2. On November 13, 1997, the United States filed a motion for leave to participate as amicus curiae; that motion was granted, without opposition from the State, at the hearing on November 14, 1997.

3. Section 5 provides, in relevant part:

Whenever a [covered] State or political subdivision ... shall enact or seek to administer any voting qualification or prerequisite to voting,

or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, ... such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in

preclearance procedure 'to forestall the danger that local decisions to modify voting practices [would] impair minority access to the electory process.'" *Lopez v. Monterey County*, 519 U.S. 9, 117 S.Ct. 340, 348, 136 L.Ed.2d 273 (1996) (quoting *McDaniel v. Sanchez*, 452 U.S. 130, 149, 101 S.Ct. 2224, 2236, 68 L.Ed.2d 724 (1981)). In order to accomplish this objective, Congress gave "exclusive authority to pass on the discriminatory effect or purpose of an election change to the Attorney General and to the District Court for the District of Columbia." *Id.* 117 S.Ct. at 348. When reviewing a complaint alleging that the State has failed to preclear election changes under § 5, therefore, this three-judge court lacks authority to consider the discriminatory purpose or effect of the proposed changes. *Id.* 117 S.Ct. at 348–49. Instead, "[t]he three-judge district court may determine only whether § 5 covers a contested change, whether § 5's approval requirements were satisfied, and if the requirements were not satisfied, what temporary remedy, if any, is appropriate." *Id.* 117 S.Ct. at 349.

### Mootness

 Before turning to the merits of the State's motion to dismiss, we first address the State's argument that this case is moot. In general, a case is moot for Article III purposes if the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome. *See Murphy v.*

section 1973b(f)(2) of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: Provided, That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made.... Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court.
42 U.S.C. § 1973c.

*Hunt*, 455 U.S. 478, 481, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982). According to the State, this case is moot because both Justice Hardberger and Justice Angelini have assumed their new offices and no vacancy currently exists on the Fourth Court of Appeals. Although the passage of time has rendered LULAC's motion for a temporary restraining order moot,[4] a case is not moot so long as any claim for relief remains viable. *See In Matter of Commonwealth Oil Ref. Co.*, 805 F.2d 1175, 1181 (5th Cir.1986). In this case, because the procedure for replacing judges who seek to resign prospectively is still in effect and has not been precleared, LULAC's remaining claims for a declaratory judgment and a preliminary injunction remain live. *See Morse v. Republican Party of Virginia*, 517 U.S. 186, 116 S.Ct. 1186, 1213 n. 48, 134 L.Ed.2d 347 (1996) (rejecting an argument that a case challenging a party convention delegate filing fee under § 5 was moot because the party convention had already been held); 28 C.F.R. § 51.10 ("The obligation to obtain such preclearance is not relieved by unlawful enforcement."). Accordingly, we find the State's argument unpersuasive.[5]

### The State's Motion to Dismiss

#### A.

The State first argues that § 5 is inapplicable because the Texas Supreme Court's decision in *Hardberger* did not constitute a

4. In its motion for a temporary restraining order, LULAC sought an order requiring the State to hold an election in November 1996 to fill Justice Hardberger's Associate Justice office. To the extent that LULAC's motion for a temporary restraining order is still pending before this court, it is hereby DISMISSED AS MOOT.

5. The State also argues that LULAC does not have standing to bring this action because it has not shown that "any of its members have been 'aggrieved' by an act 'fairly traceable' to the defendant's actions which has abridged their voting rights on account of race or color." We disagree. LULAC's members are residents of the State of Texas, some of whom reside in the Fourth Judicial District. Accordingly, LULAC has standing to bring this action on their behalf. To the extent that the State argues that LULAC has not alleged that the challenged changes affected its members' voting rights on account of race or color, we remind the State of our limited role in resolving this dispute. *See Lopez*, 117 S.Ct. at 348–49.

change in the practice and procedure for filling the vacancy left by a judge who prospectively resigns prior to the expiration of his elected term. We disagree.

Before *Hardberger*, Texas's procedure for replacing judges who submitted a resignation letter before the next general election but to be effective after the election was governed by the Texas Supreme Court's decision in *Texas Democratic Exec. Committee v. Rains*, 756 S.W.2d 306 (Tex.1988). In *Rains*, the Honorable Rudolph Esquivel, an Associate Justice of the Fourth Court of Appeals of the State of Texas, tendered his written resignation to Bill Clements, then the Governor of Texas, to be effective January 1, 1989. Although Governor Clements received the resignation on June 21, 1988, he informed Justice Esquivel that he would not accept his resignation until November 1988. Subsequently, Ron Carr, the chairman of the Texas Democratic Executive Committee, submitted a request to Jack Rains, the Texas Secretary of State, for certification in the November 1988 general election as the Democratic candidate for the unexpired term of Justice Esquivel. Secretary Rains, however, refused to act on Carr's certification request on the grounds that he had no authority to do so until a vacancy existed in the office. According to Secretary Rains, no vacancy would exist until Governor Clements accepted Justice Esquivel's resignation. Carr then filed a petition for a writ of mandamus with the Texas Supreme Court to compel Secretary Rains to accept Carr's certification.

In the petition, Carr argued that Governor Clements had no discretion but to accept Justice Esquivel's resignation so long as it complied with the three requirements of § 201.001(a) of the Texas Election Code—i.e., that the resignation be in writing, signed by the official, and delivered to the appropriate authority for acting on the resignation. The Texas Supreme Court agreed and conditionally granted the writ of mandamus, explaining:

> Once a resignation is written, signed and delivered to the appropriate authority, that authority has no discretion in the matter and is compelled to accept it. This construction is consistent with the overall purpose of the statute. Title 12, when read as a whole, clearly was intended to protect the right of the voters of this state to choose their elective officers.
>
> *Pursuant to Title 12 of the Texas Election Code, we hold that for the limited purpose of triggering the electoral process, a vacancy in Justice Esquivel's office exists as a matter of law.*

756 S.W.2d at 307 (emphasis added). After the Texas Supreme Court's decision in *Rains*, § 201.023 was amended to codify the Texas Supreme Court's opinion, and the United States Attorney General precleared those amendments in 1989.

Thus, before the Texas Supreme Court's decision in *Hardberger*, Texas's election procedure permitted a resigning judge to be succeeded by an elected interim judge with no opportunity for gubernatorial appointment if the judge submitted a resignation before the next general election but stated that the resignation would not be effective until after the election. After *Hardberger*, however, no vacancy exists for purposes of triggering an election to select an interim replacement until the resigning judge actually leaves office. Consequently, *Hardberger* provides that there will now be an opportunity for gubernatorial appointment whenever a judge resigns. This constitutes a clear change from the pre-*Hardberger* procedure under which a judge's submission of a resignation letter before the next general election triggered an election and enabled voters to choose the interim successor.

In order to escape this conclusion, the State seeks to focus on the Texas Supreme Court's reliance on Article V, § 28 of the Texas Constitution instead of on the invalidation of the election procedure established in § 201.023. The State contends that Article V, § 28 is unchanged and that, therefore, there has been no change in voting practices. In determining whether a change has occurred in a state's election law, however, this court must compare the challenged law with the state's election procedures that were in fact in force or effect before the alleged change, irrespective of what those procedures should have been under a "correct" interpretation of state law. *See City of Lockhart v. United States*, 460 U.S. 125, 132–33, 103 S.Ct. 998, 1003, 74 L.Ed.2d 863 (1983);

*Perkins v. Matthews,* 400 U.S. 379, 394, 91 S.Ct. 431, 439–40, 27 L.Ed.2d 476 (1971). Although Article V, § 28 does concern the appointment authority of the Governor when there is a vacancy in a judicial office, it was Texas Election Code § 201.023 that "expressly define[d] the time at which a vacancy occurr[ed] after resignation for purposes of initiating the electoral process to fill that vacancy." *Hardberger,* 932 S.W.2d at 492. In this case, the change caused by the invalidation of the voting procedures set forth in § 201.023—practices adopted, precleared, amended, and precleared again—is at issue, not the terms of Article V, § 28.

### B.

■ In general, the change from an elected to an appointed office is precisely the type of voting change that is subject to § 5 preclearance requirements.[6] *See Allen v. State Bd. of Elections,* 393 U.S. 544, 569–70, 89 S.Ct. 817, 834, 22 L.Ed.2d 1 (1969) (holding that an amendment to a state statute that changed an elected county office to an appointed one had to be precleared under § 5); *see also Presley v. Etowah County Comm'n,* 502 U.S. 491, 502, 112 S.Ct. 820, 828, 117 L.Ed.2d 51 (1992) (stating that the change from an elected to an appointed office is one category of changes to which it has consistently found § 5 to be applicable). Nonetheless, the State argues that § 5 is inapplicable because the contested change resulted from a court decision rather than from a legislative or administrative act. As LULAC and the United States point out, however, this argument is foreclosed, at least in part, by the Supreme Court's decision in *Hathorn v. Lovorn,* 457 U.S. 255, 102 S.Ct. 2421, 72 L.Ed.2d 824 (1982).

*Hathorn* involved a 1964 Mississippi statute that was never precleared because it predated the effective date of the Voting Rights Act of 1965. The statute was never enforced, however, because county officials believed that it violated the state constitutional prohibition against local legislation. In 1975, five Winston County voters filed an action in state court seeking to enforce the neglected 1964 statute. After extensive travel through the state court system, the Mississippi Supreme Court finally ordered that the chancery court "call and require the holding of an election," despite protests that the election could not be held without first obtaining preclearance. The United States Supreme Court granted certiorari to decide whether the Mississippi Supreme Court properly ordered the election without insuring compliance with the VRA.

On review, the State did not contest that the change in election procedures ordered by the Mississippi courts was subject to § 5 preclearance. Instead, Mississippi argued that state courts do not have the authority under the VRA to decide whether § 5 applies to a proposed change in voting procedures. The Court rejected this argument, finding that state courts are not only empowered to, but, indeed, have the obligation to determine whether § 5 applies to contemplated changes in election procedures. 457 U.S. at 267–70, 102 S.Ct. at 2429–30.

In a footnote, the Court addressed the effect that a state court decree has on § 5 preclearance:

> Finally, the presence of a court decree does not exempt the contested change from § 5. We held only last Term that § 5 applies to any change "reflecting the policy choices of the elected representatives of the people," even if a judicial decree constrains those choices. *McDaniel v. Sanchez,* 452 U.S. 130, 153, 101 S.Ct. 2224, 2238, 68 L.Ed.2d 724 (1981). Although *McDaniel* involved a reapportionment plan drafted pursuant to a federal court's order, its interpretation of § 5 is equally instructive here. When state or local officials comply with a court order to enforce a state statute, there is no doubt that their actions "reflec[t] the policy choices of ... elected representatives." Indeed, if § 5 did not encompass this situation, covered jurisdictions easily could evade the statute by declining to implement new state statutes until ordered to do so by state courts. *Cf. McDaniel v. Sanchez, supra,* at 151, 101 S.Ct., at 2237

---

6. It is immaterial that the change in this case from an elected to an appointed official only affects an interim replacement (here, an interim of almost 2 years). Because this change clearly affects the right of voters to vote for and elect their judges, § 5 is applicable.

(noting that "if covered jurisdictions could avoid the normal preclearance procedure by awaiting litigation challenging a refusal to redistrict after a census is completed, [§ 5] might have the unintended effect of actually encouraging delay in making obviously needed changes in district boundaries"). In light of *McDaniel,* we conclude that a state court decree directing compliance with a state election statute contemplates "administ[ration]" of the state statute within the meaning of § 5.

457 U.S. at 266 n. 16, 102 S.Ct. at 2428 n. 16.

Thus, *Hathorn* plainly holds that the presence of a judicial decree does not necessarily foreclose the application of § 5. The State, however, attempts to limit *Hathorn* to its facts, arguing that *Hathorn* held that § 5 applies to judicial decrees only when a court orders enforcement of an unprecleared statute. According to the State, unlike *Hathorn,* the Texas Supreme Court's decision in *Hardberger* was merely a judicial decree construing a state law that had already been precleared. In response, LULAC reads *Hathorn* to mean that "all state court decrees are subject to § 5." We need not read *Hathorn* so broadly, however, to find § 5 applicable in this case.[7]

Contrary to what the State suggests, this is not simply a case of a state court interpreting an already precleared statute.[8] Instead, in *Hardberger,* the Texas Supreme Court struck down a portion of an already precleared statute on state constitutional grounds, leaving a statute that, when enforced, no longer resembles the statute that was precleared. Thus, the Texas Supreme Court accomplished by judicial decision the same result that would have occurred had the legislature amended the statute in the same fashion. We see no reason why such a change, which if enacted by the legislature would require § 5 preclearance, should not also require preclearance if it resulted from a state court opinion. Indeed, the Supreme Court has held that "the form of a change in voting procedures cannot determine whether it is within the scope of § 5." *NAACP v. Hampton County Election Comm'n,* 470 U.S. 166, 170, 105 S.Ct. 1128, 1135, 84 L.Ed.2d 124 (1985) (rejecting the argument that a change in voting practices or procedures was not subject to § 5 because it was an informal administrative effort designed to comply with a precleared state statute). Although *Hampton County* dealt with an administrative action rather than a court decision, we find the Supreme Court's reasoning equally applicable to cases in which the change in voting practices or procedures results from a state court decision. In fact, if § 5 did not cover such changes, then state court decisions striking down part of a state statute affecting voting could have the unintended effect of creating a statute that would not have been precleared, had it been enacted by the legislature, because of the discriminatory effect it would have on the voting rights of minorities. In reaching this conclusion, we are mindful that not all state court decisions striking down part of a voting statute will lead to such a result. That the change is unlikely to have such a discriminatory effect

7. As an initial matter, we note that the facts of this case are analogous in many ways to the facts of *Hathorn.* In this case, the first step resulting in the Texas Supreme Court's decision in *Hardberger* was Governor Bush's attempt to remove Justice Hardberger from office in June 1996 by insisting, contrary to existing law, that Justice Hardberger had vacated his office immediately by submitting his resignation. Because Justice Hardberger refused to step down, Governor Bush filed a quo warranto proceeding in the Texas Supreme Court. Had the Texas Supreme Court agreed with Governor Bush and found that Justice Hardberger had vacated his office by submitting his resignation, this also would have resulted in a change in Texas's election practice and procedure. In such a case, similar to *Hathorn,* the fact that a state court validated the actions of the Governor would not have exempt-ed those changes, initiated by the Governor, from the requirements of § 5. We recognize that, in this case, the Texas Supreme Court did not merely agree with the Governor as to the correct application of state law. Nonetheless, the mere fact that the court gave the Governor more than he asked for does not remove this case from the requirements of § 5.

8. Accordingly, we need not decide whether § 5 applies to state court decrees that simply interpret an already precleared statute. See *Webber v. White,* 422 F.Supp. 416, 427 (N.D.Tex.1976) (setting forth several reasons why "state judicial lawmaking (construction, interpretation, embellishment, etc., of statutes and administrative orders), as opposed to judicial enforcement of unsubmitted enactments should not be covered by [§ 5]").

in any particular case, however, does not remove the change from the purview of § 5.

■ Under these circumstances, therefore, we find that, before the State can enforce the election law resulting from the Supreme Court's decision in *Hardberger*, it must receive preclearance from either the United States Attorney General or the United States District Court for the District of Columbia. In so holding, we note that we are not requiring that the Texas Supreme Court submit a "proposed" decision for preclearance. Indeed, nothing in this opinion precludes the Texas Supreme Court from performing its state constitutional duty of determining what the state law is. When, however, that interpretation of state law results in a change in voting practices covered by § 5 of the VRA, the State may not enforce the resulting law without first complying with the preclearance requirements of § 5. *See Lopez,* 117 S.Ct. at 347. In this respect, we also recognize the potential state constitutional problems that could arise if the resulting election procedure is not precleared by either the Attorney General or by the United States District Court for the District of Columbia. Although we have little doubt that this statute will be precleared, the VRA is quite clear on the State's duty in such a situation—the statute resulting from the decision of the Texas Supreme Court must be precleared before it can be enforced.

### LULAC's Motion for a Preliminary Injunction

■ Having concluded that the election law resulting from the Texas Supreme Court's decision in *Hardberger* constituted a change affecting voting without receiving preclearance, the sole issue remaining before the Court is the scope of injunctive relief, if any, to which LULAC is entitled. As noted above, if a voting change subject to the requirements of § 5 has not been precleared, § 5 plaintiffs are entitled to an injunction prohibiting implementation of that change. *See Lopez,* 117 S.Ct. at 347; *Allen,* 393 U.S. at 555, 89 S.Ct. at 826. Accordingly, the State of Texas and its officers are hereby ENJOINED from enforcing the election law resulting from the decision of the Texas Supreme Court in *The State of Texas ex. rel. Karen Angelini v. The Honorable Phil Hardberger,* 932 S.W.2d 489 (Tex.1996), until the State receives preclearance of the resulting law from the United States Attorney General or from the United States District Court for the District of Columbia. To that end, the State is hereby ORDERED to submit a request for preclearance to either the United States Attorney General or to the United States District Court for the District of Columbia within thirty (30) days of the date of this order. Until such preclearance is received, or until the State enacts a superseding statute that has been precleared, judicial vacancies must be filled in accordance with the procedures set forth in *Texas Democratic Executive Committee v. Rains,* 756 S.W.2d 306 (Tex.1988), subsequently codified as Texas Election Code § 201.023, and precleared by the United States Attorney General in 1989.

In addition to the above injunctive relief, LULAC also seeks an order removing Justice Angelini from office and directing the State to hold a special election to fill the resulting vacancy. Although we recognize that it may be appropriate in some cases to undo the enforcement of an unprecleared change, *see NAACP v. Hampton County Election Com'n,* 470 U.S. 166, 183 n. 36, 105 S.Ct. 1128, 1130 n. 36, 84 L.Ed.2d 124 (1985); *Hadnott v. Amos,* 394 U.S. 358, 367, 89 S.Ct. 1101, 1106, 22 L.Ed.2d 336 (1969), we decline to do so at this time.

As an initial matter, we note that courts have been reluctant to call for new elections where unprecleared changes have been enforced until the jurisdiction is afforded the opportunity to seek preclearance. *See Berry v. Doles,* 438 U.S. 190, 98 S.Ct. 2692, 57 L.Ed.2d 693 (1978). LULAC nonetheless argues that a new election is warranted in this case because the State has not sought preclearance during the pendency of this suit. Although we agree that the State could have easily pursued such a course and thereby resolved much, if not all, of the controversy before this court, we note that for much of the time in question, the State had no reason to seek such preclearance because this court had previously dismissed LULAC's complaint on the grounds that the decision in *Hardberger* was not subject to § 5 preclear-

ance.[9] Under these circumstances, we decline to attach much significance to the State's decision to challenge the applicability of § 5 to the facts of this case.

In addition, unlike *Hadnott,* on which LULAC primarily relies, the changes in this case are not clearly discriminatory. On the contrary, after examining the nature of the changes complained of, we find it difficult to believe that those changes have a racially discriminatory effect.[10] *See Perkins,* 400 U.S. at 396, 91 S.Ct. at 440 (stating that, when considering whether to undo the enforcement of an unprecleared change, a district court should consider "the nature of the changes complained of, and whether it was reasonably clear [when the changes were enforced] that the changes were covered by § 5").

Moreover, we decline to order a special election in light of the fact that the current election process has already commenced. In fact, the deadline for entering the elections has already passed, the primaries have been set, and the general election is scheduled for November 1998, at which time the Associate Justice position in question will be filled by the voters of the Fourth Judicial District. Under these circumstances, we find that ordering a special election would be inappropriate. Accordingly, LULAC's motion for a preliminary injunction is DENIED insofar as it seeks an order requiring the State of Texas to hold a special election to fill the seat currently held by Justice Angelini.

Alternatively, LULAC requests that this court remove Justice Angelini from office so that no political advantage is gained from the State's failure to obtain § 5 preclearance. In addition to the reasons set forth above, we note that, as a practical matter, simply removing Justice Angelini from office would be a futile gesture. It is unquestioned that, under longstanding Texas law not affected by the preclearance issues decided today, Governor Bush could simply reappoint Justice Angelini to fill the vacancy that we would create. To the extent that LULAC requests that we should not only remove Justice Angelini from office but also preclude Governor Bush from exercising his power of appointment to fill the resulting vacancy, we decline, under the circumstances of this case, to deprive the people of the Fourth Judicial District of the services of a justice for the next eight months. Accordingly, LULAC's motion for a preliminary injunction is DENIED insofar as it seeks an order removing Justice Angelini from office.

## JUDGMENT

BE IT REMEMBERED that on the 3rd day of March 1998, the court entered its order in the above styled and numbered cause denying defendant's motion to dismiss and granting in part and denying in part plaintiff's motion for a preliminary injunction.

Pursuant to that order, the court enters the following judgment: IT IS ORDERED, ADJUDGED, AND DECREED that the State of Texas is hereby ENJOINED from enforcing the election law resulting from the decision of the Texas Supreme Court in *The State of Texas ex. rel. Karen Angelini v. The Honorable Phil Hardberger,* 932 S.W.2d 489 (Tex.1996), until it receives preclearance of the resulting law from the United States Attorney General or from the United States District Court for the District of Columbia.

IT IS FURTHER ORDERED that the State of Texas submit a request for preclearance of that law to either the United States Attorney General or to the United States District Court for the District Court within thirty (30) days of the date of this judgment.

IT IS FURTHER ORDERED that until such preclearance is received, or until the State enacts a superseding statute that has been precleared, judicial vacancies must be filled in accordance with the procedures set forth in *Texas Democratic Executive Committee v. Rains,* 756 S.W.2d 306 (Tex.1988),

9. We further note that Governor Bush reappointed Justice Angelini only after this court dismissed LULAC's complaint.

10. We expressly note that we reach this conclusion for the sole purpose of deciding the appropriate relief at this time. In the event that the Attorney General or the district court for the District of Columbia determines that the election scheme resulting from the Texas Supreme Court's decision in *Hardberger* does have such an effect, we will reexamine the appropriate relief at that time.

subsequently codified as Texas Election Code § 201.023, and precleared by the United States Attorney General in 1989.

IT IS FURTHER ORDERED that all other affirmative relief requested by any party herein is DENIED.

IT IS FINALLY ORDERED that all costs are taxed to the defendant State of Texas.