**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

No. 97-20138
No. 98-20001
_____


JOHN D HARRIS; ET AL,


                          Plaintiffs,

JOHN D HARRIS; HARRIS COUNTY UTILITY DISTRICT,
No 1,2,3,4,5,8,10,93,145,236,262,350 and 356

                    Plaintiffs - Appellants,


versus


CITY OF HOUSTON,


                    Defendant - Appellee.


Appeals from the United States District Court
      For the Southern District of Texas

August 11, 1998

Before KING, EMILIO M. GARZA, and DeMOSS, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

    These consolidated appeals challenge the district court's refusal to enjoin the City of Houston's annexation of a residential area known as Kingwood. Finding that we can no longer grant plaintiffs the relief they requested below, we vacate the district court's prior orders and remand with instructions to dismiss the case as moot.

I

In January 1996, the City of Houston, Texas (the "City") began discussing the possibility of annexing a relatively affluent, non-minority-dominated residential area north of the City, known as "Kingwood."  Throughout the year, the City mayor met with various representatives from Kingwood, and the City Council held various hearings on the subject.  On December 11, 1996, the City Council enacted separate ordinances annexing Kingwood and abolishing its thirteen utility districts—effective the following day.

On December 23, 1996, the City requested preclearance of the annexation from the Department of Justice ("DOJ"), pursuant to § 5 of the Voting Rights Act of 1965 ("Voting Rights Act"), P. L. No. 89-110, 79 Stat. 439 (codified as amended at 42 U.S.C. § 1973 et seq.).  The City held a special election on January 18, 1997, and a resulting runoff election on February 15—both unrelated to the issue of annexation.[1]  Because the DOJ did not grant preclearance until February 24, Kingwood residents were not permitted to participate in these elections.  *See* 42 U.S.C. § 1973 (holding that no change in voting takes effect until precleared).  The parties agree that as of the date of this appeal, the annexation of Kingwood has been fully accomplished, and no further obstacles remain to Kingwood residents voting in City elections.

This suit, instituted in October 1996, before the City actually accomplished the annexation, was brought by many different

---

[1] The special election was held to fill a vacant at-large City Council seat and to consider a proposed charter amendment and a proposed ordinance, both of which were placed on the ballot by a petition of City residents.  The run-off election in February was for the City Council seat.

plaintiffs alleging different injuries as well as separate causes of action. The one common denominator for the group was their unanimous request for relief——an injunction against the annexation and all efforts to implement it. Mary Almanderez and Thomas Phillips ("minority plaintiffs"), minority residents of the City, alleged that both the purpose and effect of the annexation were to dilute the votes of minority residents, in violation of the Voting Rights Act and the Fifteenth Amendment. Kingwood's thirteen utility districts——namely Harris County Utility Districts Nos. 1, 2, 3, 4, 5, 8, and 10 and Harris County Municipal Utility Districts Nos. 93, 262, 350, and 356 (collectively, "Utility Districts" or "Districts")——claimed that the December 11 ordinances exceeded the City's statutory annexation authority as set out in various sections of the Texas Local Government Code. John D. Harris, a resident of Kingwood, alleged that permitting the annexation to go forward before the January election would deprive him of his right to vote in violation of the Fourteenth and Fifteenth Amendments.

In addition to requesting an injunction against the annexation and all implementing actions such as the seizure of property and the provision of certain basic services to Kingwood residents, Almanderez, Phillips, Harris and the Utility Districts (collectively "plaintiffs") requested that the district court stay the annexation at least until the January election and preferably until some final decision could be reached on the state-law claims of the Utility Districts. In the alternative, the plaintiffs requested that if the annexation went forward, the special election

scheduled for January 18th be enjoined until the City received preclearance and could permit Kingwood residents to vote. The plaintiffs also requested declaratory relief to the effect that the City's actions were unconstitutional and invalid under state law. At no time did any plaintiff request damages, nominal or compensatory, nor did any plaintiff request that the district court invalidate the special election or dismantle the annexation once accomplished.[2]

Following an evidentiary hearing, the district court denied plaintiffs' request for preliminary injunctive relief and dismissed the claims of the Utility Districts for lack of standing. Harris and the Utility Districts ("appellants") appealed from this order, but before we heard arguments in the case, the district court entered a final judgment denying all relief to the plaintiffs. The appellants subsequently filed a second notice of appeal, and on their unopposed motion we consolidated the first appeal from the district court's denial of a preliminary injunction with the second appeal from the district court's final judgment in favor of the

---

[2] The plaintiffs' second amended complaint does request that the district court "enjoin the annexation and all efforts to implement the annexation as void *ab initio*." In other pleadings, the plaintiffs request that the district court find the annexation void or declare it void under state law. Yet the relief requested as a result of those proposed findings was always the same—enjoin or stay the annexation and its implementation until the election or at least until a determination of the merits of the state-law claims. Simply by phrasing their new appellate claims for relief in terms of "voiding" the annexation, as opposed to disannexing or undoing the annexation, does not eliminate the fact that the plaintiffs sought only an injunction or a stay below. Had they wished to bring any other claim for relief, they could have moved to amend their complaint.

City.  The minority plaintiffs appealed neither from the denial of preliminary injunctive relief, nor from the district court's final judgment.  Their claims regarding the allegedly discriminatory purpose and impact of the annexation, styled under the Voting Rights Act as well as the Fifteenth Amendment, are therefore not before us.[3]

## II

"To qualify as a case fit for federal-court adjudication, 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'"  *Arizonans for Official English v. Arizona*, 520 U.S. 43, ___, 117 S. Ct. 1055, 1068, 137 L. Ed. 2d 170 (1997).  Whether an actual controversy remains at this stage of the litigation is a question that we resolve *de novo*.[4]  *See Elder v. Holloway*, 510 U.S. 510, 516, 114 S. Ct. 1019, 1023, 127 L. Ed. 2d 344 (1994) (noting that questions of

---

[3] Any claims relating to § 5 of the Voting Rights Act are also not before us, given that a three-judge panel was convened pursuant to § 5 specifically to address those claims.  *See* 42 U.S.C. § 1973c (authorizing the appointment of a three-judge court to adjudicate claims of § 5 violations).  The three-judge panel held a hearing on December 17, 1996, and issued its order three days later, stating that no violations of § 5 had occurred.  No party has appealed from this decision.

[4] Although the appellants allege in their reply brief that the City has raised the issue of mootness for the first time on appeal, they do not dispute that we must address the issue.  *See Joseph v. City of New Orleans*, 110 F.3d 252, 253 (5th Cir. 1997) (noting that we must examine the basis of our jurisdiction, even *sua sponte* when necessary).  *Cf. Marathon Oil Co. v. Ruhrgas*, No. 96-20361, 1998 WL 329842, at *4 (5th Cir. June 22, 1998) (en banc) ("The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'") (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382, 4 S. Ct. 510, 511, 28 L. Ed. 462 (1884)).

law generally "must be resolved *de novo* on appeal").

As an initial matter, we find it beyond dispute that a request for injunctive relief generally becomes moot upon the happening of the event sought to be enjoined. *See*, *e.g.*, *Garza v. Westergren*, 908 F.2d 27, 29 (5th Cir. 1990) (holding plaintiff's request for an injunction to stay a contempt proceeding moot "[b]ecause the contempt proceeding has occurred"); *Seafarers Int'l Union of N. Am. v. National Marine Servs., Inc.*, 820 F.2d 148, 151-52 (5th Cir. 1987) ("[O]nce the action that the plaintiff sought to have enjoined has occurred, the case is mooted because 'no order of this court could affect the parties' rights with respect to the injunction we are called upon to review.'") (quoting *Honig v. Students of the Cal. Sch. for the Blind*, 471 U.S. 148, 149, 105 S. Ct. 1820, 1821, 85 L. Ed. 2d 114 (1985)); *Marilyn T., Inc. v. Evans*, 803 F.2d 1383, 1384 (5th Cir. 1986) (holding plaintiff's appeal from the denial of preliminary injunctive relief against the suspension of a license moot once the license was permanently revoked); *Brown v. New Orleans Clerks and Checkers Union Local No. 1497*, 590 F.2d 161, 164 (5th Cir. 1979) (holding defendants' appeal from the grant of an injunction moot because "[t]his court could fashion no order that would change the relationship of the parties"); *see also Oakville Dev. Corp. v. FDIC*, 986 F.2d 611, 613 (1st Cir. 1993) (holding that an appeal becomes moot once circumstances dictate that the court can no longer grant meaningful relief) (collecting cases). At that point, no order of the court can affect the rights of the parties with regard to the requested

relief.  *See DeFunis v. Odegaard*, 416 U.S. 312, 316, 94 S. Ct. 1704, 1705, 40 L. Ed. 2d 164  (1974) (noting that the "starting point" for an analysis of mootness is the "familiar proposition that 'federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them'") (quoting *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S. Ct. 402, 404, 30 L. Ed. 2d 413 (1971)).  Applying this general rule to the case at hand, the claims of the appellants for prospective relief against the annexation and the special election are indeed moot. Kingwood has been a part of the City for almost a year and a half; since the January 1997 election and subsequent February run-off, the entire City Council has gone through an election cycle, with no impediment to Kingwood's participation.  The Constitutional harms Harris sought to enjoin, if indeed there were any, have come and gone; we simply cannot enjoin that which has already taken place.

Harris and the Districts nevertheless raise several arguments in an attempt to demonstrate the existence of an ongoing, live controversy.  First, the appellants cite *Vieux Carre Property Owners, Residents, & Assocs., Inc. v. Brown*, 948 F.2d 1436, 1446 (5th Cir. 1991), for the proposition that "a suit is moot only when it can be shown that a court cannot even 'theoretically grant' relief."  In an attempt to demonstrate how we might "theoretically" find a remedy for their claims, the appellants suggest that we order the annexation undone or, in the alternative, that we invalidate the results of the January 18th election and subsequent February run-off.  These arguments illustrate not only a fatal

misconstruction of *Vieux Carre*, but also an inadequate recognition of our role in resolving, rather than reviving, legal disputes.

In *Vieux Carre*, an historic preservation society (the "Society") brought suit against the Army Corps of Engineers (the "Corps") alleging that the Corps had authorized the construction of an aquarium and park on the Mississippi riverfront without the proper consultation procedures mandated by the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470 et seq. *Vieux Carre*, 948 F.2d at 1439-40. The Society "sought a judgment declaring that the Corps must comply with the historic review process, and also sought an injunction to keep certain non-federal parties from proceeding with the riverfront project." *Id.* at 1440. Following an appeal and remand, the substance of which is irrelevant for our purposes, the district court dismissed the suit as moot, in light of the fact that the park and acquarium were "virtually complete." *Id.* at 1441. We reversed the district court's finding of mootness, noting that although it was possible that forcing the Corps to perform a review under the NHPA would result in no "meaningful relief," it was also possible that review under NHPA standards might, even at this late date, result in the "implement[ation] [of] measures, great or small, in mitigation of some or all adverse effects, if any, wrought by the park." *Id.* at 1446-47. Granting the relief of NHPA review was therefore "theoretical" not in the sense that we had imagined possibilities beyond those requested in the complaint, but rather in the sense that we had given the plaintiff the benefit of the doubt as to whether certain requested

-8-

relief would in fact ease or correct the alleged wrong.

Viewed in this light, *Vieux Carre* contains no support for the appellant's notion that we may fashion relief not requested below in order to keep a suit viable. To the extent that any broad language in *Vieux Carre* may be read as such, it is necessarily limited by our explicit holdings in other cases, *see, e.g., Marilyn T.*, 803 F.2d at 1384-85 (rejecting plaintiff's suggestion that mootness may be avoided by granting a request for relief not first addressed by the district court), as well as by the Supreme Court's recent, stinging rebuke of the Ninth Circuit in *Arizonans for Official English*.

The opening paragraphs of that opinion speak with unmistakeable clarity to the present case:

> Federal courts lack competence to rule definitively on the meaning of state legislation, nor may they adjudicate challenges to state measures absent a showing of actual impact on the challenger. The Ninth Circuit, in the case at hand, lost sight of these limitations. . . .
> [The initiating plaintiff, Maria-Kelly F.] Yniguez commenced and maintained her suit as an individual, not as a class representative. A state employee at the time she filed her complaint, Yniguez voluntarily left the State's employ in 1990 and did not allege she would seek to return to a public post. Her departure for a position in the private sector made her claim for prospective relief moot. Nevertheless, the Ninth Circuit held that a plea for nominal damages could be read into Yniguez's complaint to save the case, and therefore pressed on to an ultimate decision. . . .
> The Ninth Circuit had no warrant to proceed as it did. The case had lost the essential elements of a justiciable controversy and should not have been retained for adjudication on the merits by the Court of Appeals.

*Arizonans for Official English*, 117 S. Ct. at 1059. No meaningful distinction from *Arizonans for Official English* exists on the facts

before us.  The plaintiffs in this case, just like Yniguez, sought only prospective relief below.[5]  On appeal, just like Yniguez, they suggest that we "read into" their complaint additional requests for relief and then proceed to an adjudication on the merits.  As the Supreme Court noted, however, we have "no warrant" to proceed in such a fashion.  The "case and controversy" requirement of Article III is no mere formality—a nuisance to be brushed away before setting down to the business of constitutional interpretation.  The appellants began this suit by requesting certain, specific relief, and because we can no longer grant that relief, the case is moot.[6]

---

[5] The fact that the appellants here requested declaratory relief in addition to an injunction cannot save their appeal from dismissal.  Requests for declaratory relief may sustain a suit only when the claims "challenge . . . some ongoing underlying policy" rather than "merely attack[ing] an isolated . . . action." *City of Houston v. HUD*, 24 F.3d 1421, 1429 (D.C. Cir. 1994); *see also Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 125-26, 94 S. Ct. 1694, 1700, 40 L. Ed. 2d 1 (1974) (holding that for declaratory relief to save a suit from mootness, "[i]t is sufficient that the litigant show the existence of an immediate and definite governmental action or policy that has adversely affected and *continues to affect* a present interest") (emphasis added).  The appellants make no claim on appeal that the City has a defective annexation "policy," or even that the City has any policy with respect to annexations at all.

[6] Harris also argues that his constitutional claims fall within the "capable of repetition yet evading review" exception to the mootness doctrine because "[s]ome possibility clearly exists that the City would implement future voting changes affecting Plaintiffs without obtaining the requisite preclearance, again denying Plaintiffs their rights to vote and run in elections" and also because "if the City is correct in its assertion that a voting rights issue becomes moot once the relevant election is held, then the type of harm to Plaintiffs clearly is of such limited duration that it is likely to be moot before litigation is completed."  This thinly veiled attempt to conflate Harris' claims with those of the minority plaintiffs is unavailing; the minority plaintiffs have not appealed, and their claims are not before us.  Moreover, the idea that elections may come and go with no opportunity for effective appellate review may seem compelling, but it is so only as to those

-10-

III

"When a civil case becomes moot pending appellate adjudication, '[t]he established practice . . . in the federal system . . . is to reverse or vacate the judgment below and remand with a direction to dismiss." *Arizonans for Official English*, 520 U.S. at ___, 117 S. Ct. at 1071 (quoting *United States v. Munsingwear, Inc*., 340 U.S. 36, 39, 71 S. Ct. 104, 106, 95 L. Ed. 36 (1950)). We see no reason to depart from that practice here. The district court's order of January 22, 1997, denying preliminary injunctive relief to the plaintiffs and dismissing the claims of the Utility Districts for lack of standing, and its final judgment in favor of the City, issued November 20, 1997, to the extent that such order and judgment address the claims of the appellants, are therefore VACATED and the case REMANDED with instructions to

---

potential plaintiffs that in fact have a constitutionally protected "right" to vote in a given election. Because voting rights are fundamentally statutory and not constitutional in origin, *see Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9, 102 S. Ct. 2194, 2199, 72 L. Ed. 2d 628 (1982) ("[T]his Court has often noted that the Constitution does not confer the right of suffrage upon any one, and that the right to vote, *per se*, is not a constitutionally protected right") (citations and internal quotation marks omitted), Harris cannot refute the plain language of 42 U.S.C. § 1973, providing that certain statutory boundary changes have "no legal effect" with regard to conferring the franchise until precleared by the Attorney General. To the extent that Harris argues that his right to vote arises not from a boundary-changing statute but from the fact of governance, this argument is foreclosed by *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 69, 99 S. Ct. 383, 389, 58 L. Ed. 2d 292 (1978) ("Appellants' argument that extraterritorial extension of municipal powers requires concomitant extraterritorial extension of the franchise proves too much.").

Alternatively, even if Harris did have a constitutionally protected right to vote in City elections as of January 1997, he could have preserved his suit by requesting even nominal damages as opposed to resting completely on the request for injunctive relief.

DISMISS AS MOOT.


ENDRECORD

DeMOSS, Circuit Judge, dissenting:

NO TAXATION WITHOUT REPRESENTATION -- there is no more fundamental principle of American democracy.[7] Our forefathers fought a revolutionary war to secure the blessings of that principle, and the resulting birth of this nation marked the beginning of a new era of government by the people.

Consequently, as a resident of Houston I am disappointed that this most fundamental principle has been disregarded by the Houston City Council and its City Attorney. The City of Houston annexed Kingwood on December 11, 1996 -- just in time to ensure that the City could collect taxes from Kingwood residents for the entirety of 1997. This annexation was not consensual on the part of the residents of Kingwood, as this lawsuit so clearly indicates. On January 18, 1997, the City of Houston held a special election to allow its citizens to vote on several municipal issues.[8] But

_____

[7] *See, e.g.*, THE DECLARATION OF INDEPENDENCE para. 1 (U.S. 1776), *in* ESSENTIAL WORKS OF THE FOUNDING FATHERS 189, 191 (Leonard Kriegel, ed., Bantam Books 1964) (criticizing the despotic British monarch George III "[f]or imposing Taxes on us without our Consent"); JOHN DICKINSON, LETTERS FROM A FARMER IN PENNSYLVANIA (1768), *in* ESSENTIAL WORKS OF THE FOUNDING FATHERS, *supra* at 23, 60 (noting, in the course of denouncing the Townshend Acts, that "*Those* who are *taxed* without their own consent, expressed by themselves or their representatives, are *slaves*". (emphasis in original)); *cf*. THOMAS JEFFERSON, A SUMMARY VIEW OF THE RIGHTS OF BRITISH AMERICA (1774), *in* ESSENTIAL WORKS OF THE FOUNDING FATHERS, *supra* at 97, 112-13 (warning the British that the Americans would not tolerate that "it be proposed that our properties within our own territories shall be taxed or regulated by any power on earth but our own").

[8] The issues on the ballot included (1) election of an at-large City Council member, (2) a referendum to request an ordinance raising the City's minimum wage, and (3) a referendum to request an amendment to the City Charter limiting governmental taxing authority.

residents of Kingwood, who had just become residents of Houston, were not permitted to participate in those important public decisions by the City of Houston. Democracy failed. Kingwood residents were taxed beginning on January 1, yet had no voice at the polls on January 18. Thomas Paine surely turned over in his grave!

I am also disappointed that my colleagues now think that this case is moot. Of course we are unable to provide the prospective injunctive relief that the plaintiffs originally sought. But the plaintiffs asked for other relief which the courts can provide, and the serious constitutional violations asserted in this case demand consideration. Accordingly, I respectfully dissent.

## I.

In declaring the plaintiffs' claims to be moot, the panel majority observes that the following relief has been sought: (1) an injunction against the City's annexation and implementation efforts (namely, seizure of property and providing municipal services); (2) a stay of annexation until after the impending election and a decision on the merits of the plaintiffs' state-law claims; (3) an injunction of the election until preclearance so that Kingwood residents could vote; and (4) a declaratory judgment that the City's actions were defective under the federal Constitution and invalid under state law. *See* Majority Op. at 3-4. The majority then proceeds to characterize the plaintiffs' requested relief in three particular ways: (1) preliminary injunctive relief; (2)

-14-

declaratory relief; and (3) *not* monetary relief.  The majority then concludes that because the annexation and voting have already taken place, the case is mooted by the plaintiffs' failure to request anything other than injunctive relief of a preemptive nature.  The requested declaratory judgment is deemed by the majority to be insufficient to create a case or controversy because the plaintiffs have not alleged continuing injury from a defective annexation policy.  *See* Majority Op. at 10 n.5 (citing **Super Tire Eng'g Co. v. McCorkle**, 416 U.S. 115, 125-26, 94 S. Ct. 1694, 1700 (1974), and **City of Houston v. Dep't of Housing & Urban Dev.**, 24 F.3d 1421, 1429 (D.C. Cir. 1994)).

This case is not moot.  The plaintiffs sufficiently articulated a request for permanent remedial injunctive relief, their request for declaratory judgment is justiciable, and even if some ambiguity can be found in the pleadings, their request for "all further relief to which they may show themselves to be justly entitled" should compel this Court to liberally construe their pleadings in a fashion consistent with a live, continuing controversy.

**A.**

The plaintiffs plainly asked the district court to "enjoin . . . the Annexation as void *ab initio*."  Majority Op. at 4 n.2.  The majority's opinion hinges entirely on its interpretation of this plea as a request for prospective injunctive relief exclusively.  The majority opines that the fact that the plaintiffs

-15-

"phras[ed] their new appellate claims for relief in terms of 'voiding' the annexation, as opposed to disannexing or undoing the annexation, does not eliminate the fact that the plaintiffs sought only an injunction or a stay below." Majority Op. at 4 n.2. This interpretation of the plaintiffs' complaint does not withstand scrutiny.

The plaintiffs asked the district court to "enjoin . . . the Annexation as void *ab initio*." The verb "enjoin" means: "To require; command; positively direct. To require a person, by writ of injunction, to perform, or to abstain or desist from, some act." BLACK'S LAW DICTIONARY 529 (6th ed. 1990). "Void" means: "Null; ineffectual; nugatory; having no legal force or binding effect; unable, in law, to support the purpose for which it was intended." *Id.* at 1573. "*Ab initio*" means: "From the beginning; from the first act; from the inception." *Id.* at 6. Thus, to paraphrase, the plaintiffs asked the district court to require that the City desist from actions implementing the annexation because the annexation, from its inception, had no legal force or binding effect. That request is indistinguishable from the majority's proposed formulations of "disannexing or undoing the annexation." Majority Op. at 4 n.2. Because the plaintiffs' request for relief is not, as the majority has characterized it, exclusively a request for an injunction to prevent the commencement of an action which

-16-

has already happened, vacating this case on mootness grounds is an extraordinary dodge.[9]

## B.

To find that this case is moot, the majority also determines that the plaintiffs' request for declaratory judgment does not preserve a live controversy. The explanation provided is that "[t]he appellants make no claim on appeal that the City has a

_____

[9]    This analysis of the relief sought in this case amply demonstrates that the panel majority has placed more weight on the decision in **Arizonans for Official English v. Arizona**, 117 S. Ct. 1055 (1997), than that case will bear. *See* Majority Op. at 9-10. In the **Arizonans** case, plaintiff Yniguez contended that Arizona's state constitutional provision that "the State 'shall act in English and in no other language'" meant that "she would lose her job or face other sanctions if she did not immediately refrain from speaking Spanish while serving the State." **Arizonans for Official English**, 117 S. Ct. at 1060 (quoting ARIZ. CONST. art. XXVIII, § 3(1)(a)). Between the time of trial and the Ninth Circuit's treatment of the case on appeal, Yniguez left her job with the state. There was no longer any threat that she would be fired or punished because she no longer worked for the state. The case was moot because the controversy had completely vanished. **Arizonans** establishes no new principles of mootness, and that decision does not control this case.

In the present case, the plaintiffs continue to suffer from the impact of the initially alleged violations. Kingwood residents have challenged the City's authority for the annexation of Kingwood, and they continue to live in Kingwood, subject to City governance. Former Kingwood utility districts raised similar challenges; their property has been seized and they now serve no function because the City provides services to Kingwood. This impact, created by the City's allegedly unlawful actions, did not vanish once the annexation was accomplished and a new round of elections was held. Thus, unlike the single plaintiff in **Arizonans** who defused the litigation by removing herself from the work environment which gave rise to the case, these plaintiffs have alleged injuries which, if established, continue to this day, and they have done nothing to cause those injuries to disappear.

-17-

defective annexation 'policy,' or even that the City has any policy with respect to annexations at all."  Majority Op. at 10 n.5.

The applicable law is not so simple.  The mootness inquiry in a case involving circumstances that change between the inception of the lawsuit and the time of final decision is intensely case-specific.  *See generally* 13A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3533.3 (2d ed. 1984).  As Professor Wright's leading treatise notes in summary:

> The central question is whether it remains appropriate to provide a declaration of rights and perhaps some additional remedy.  The answer to this question is controlled by remedial inventiveness, careful assessment of present circumstances, and wise predictions of the future.  . . .  As with other aspects of justiciability, the measures of mootness should not be taken in factual judgments alone.  Account also must be taken of the importance of the parties' interests, the possibility that future events may generate new facts or change the issues, and the difficulty and sensitivity of the issues.  Less remaining impact or risk of future impact should be demanded if vital interests are at stake.  More may be demanded, on the other hand, if a court is asked to resolve issues that are difficult or sensitive, lest a mistaken judgment harm both the parties and others.  The usefulness of present adjudication is also undermined by the prospect that any future dispute may provide new facts that better illuminate or even change the issues.

*Id.* at 300-01.  The treatise attempts to trace out several categories of these "changed circumstances" cases.  ***Super Tire Engineering Co. v. McCorkle***, 416 U.S. 115, 94 S. Ct. 1694 (1974), the Supreme Court case relied upon by the majority, is an example of a case in which a party, once engaged in a relevant course of action, ceased that activity during the pendency of the lawsuit but is likely to continue the interrupted course of conduct upon the

-18-

culmination of legal proceedings.  *See* 13A WRIGHT ET AL., *supra*, § 3533.3, at 281-84.  In the present case, however, the only changed circumstance is that the contested annexation, election, and referenda have taken place.  Analyzing the case in terms of the plaintiffs' state-law claims, the continuing impact is that they must live with the consequences of the City's actions, which the plaintiffs contend were ultra vires, taken pursuant to incorrect interpretations of the state's election and annexation laws.  In this respect, the case is more akin to ***Wirtz v. Local 153, Glass Blowers Association***, 389 U.S. 463, 88 S. Ct. 643 (1968), in which suit was brought to set aside an election of union officials.  A new uncontested election was held during the progress of the lawsuit, but the Supreme Court held that the suit was not moot because fulfillment of the relevant statutes depended upon their fair and legal application, and the parties thus had a continuing interest in resolving the dispute over the election even though there was no practical remedy specifically for the alleged violations.

Even in the framework outlined by the majority, it is less than clear that the plaintiffs' declaratory judgment action is not a live controversy.  The absence of a written City "policy" concerning annexations is simply not determinative.[10]  Were it

---

[10]   ***City of Houston v. Dep't of Housing & Urban Dev.***, 24 F.3d 1421 (D.C. Cir. 1994), relied upon by the majority, deals with declaratory relief against federal agencies for the purpose of invalidating a disputed policy.  Given the case-specific nature of these mootness determinations, as well as the other factors set out in the text which counsel against a determination of mootness, that case is inapposite.

necessary to identify one, however, the relevant "policy" would be the City's exercise of complete municipal authority over Kingwood as a result of the annexation, putatively accomplished in accordance with Texas law.

The balance of factors leans in favor of exercising jurisdiction over the plaintiffs' appeal from denial of declaratory and injunctive relief. There are remedies available. For example, the City could be ordered to refund taxes to the disenfranchised voters for the portion of the year during which the City denied them the right to vote, or the City could be required to resubmit the referenda that appeared on the January 18 ballot to a new special election. Parties on both sides of this litigation have a continuing interest in determining the legality of the City's annexation strategies and their impact on voting rights. These issues are likely to arise again and again as the City continues to expand and annex outlying areas. *See Storer v. Brown*, 415 U.S. 724, 737 n.8, 94 S. Ct. 1274, 1282 n.8 (1974) (applying capable-of-repetition-yet-evading-review analysis to determine that an election challenge was not moot, despite the fact that the election had already occurred, because "the construction of the statute, an understanding of its operation, and possible constitutional limits on its application, will have the effect of simplifying future challenges, thus increasing the likelihood that timely filed cases can be adjudicated before an election is held"); *Backus v. Spears*, 677 F.2d 397, 398 n.3 (4th Cir. 1982). Moreover, the plaintiffs' interests are of paramount importance: the vindication of their

fundamental constitutional rights. The issue has been squarely presented and thoroughly debated, and the parties now await adjudication of their opposing positions. Plainly, then, the declaratory judgment aspect of this case is not moot.

## C.

Finally, the plaintiffs concluded their complaint by asking for "all further relief to which they may show themselves justly entitled." There is a reason why a phrase like this is put into a complaint. The federal courts operate under a system of "notice pleading." *See* **Conley v. Gibson**, 355 U.S. 41, 47-48, 78 S. Ct. 99, 103 (1957). As long as it is plain what claims the plaintiff has asserted and what relief has been sought, a failure to recite magic words should not preclude relief. *Cf., e.g.*, **Federal Savings & Loan Ins. Corp. v. Texas Real Estate Counselors, Inc.**, 955 F.2d 261 (5th Cir. 1992) (plaintiff's pleadings, requesting "any other relief, both special and general, to which it may be justly entitled," would be construed to include an unarticulated claim for prejudgment interest).

Moreover, the Federal Rules of Civil Procedure and precedent of the Supreme Court specifically prohibit our Court from dismissing this case on the grounds that the plaintiffs asked the district court to "enjoin . . . the Annexation as void *ab initio*" rather than asking that the court "disannex" or "undo" the offensive conduct. "[E]very final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even

-21-

if the party has not demanded such relief in the party's pleadings." FED. R. CIV. P. 54(c). "[A] federal court should not dismiss a meritorious constitutional claim because the complaint seeks one remedy rather than another plainly appropriate one." *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 65, 99 S. Ct. 383, 387 (1978). The plaintiffs made it plain what relief they are seeking, and we should not play word games in order to hide behind a mootness dismissal. The majority's opinion dismissing this case on mootness grounds is therefore indefensible.

Having concluded that this case is not moot, I now turn to the merits of the plaintiffs' case.


## II.

The plaintiffs alleged that "the proposed annexation of the Kingwood area would violate the Fourteenth and Fifteenth Amendments of the United States Constitution because it would deny or abridge the voting rights of John Harris and other Kingwood residents." In the course of rejecting this claim, the district court found there is no credible evidence of racial animus with respect to the annexation of Kingwood. The trial court determined that "[t]he credible evidence establishes that the Kingwood annexation was pursued for legitimate financial and policy reasons and not for an improper racially discriminatory purpose." As indicated *infra*, the district court correctly determined that the annexation was not motivated by discriminatory intent, and therefore the plaintiffs'

Fifteenth Amendment claim is foreclosed.[11] But the broad allegation of a violation of the Fourteenth Amendment, however, remains as a completely viable and valid claim in this case.

The right to vote has been declared to be and is generally accepted as a "fundamental" right for the purposes of the Fourteenth Amendment. *See Reynolds v. Sims*, 377 U.S. 533, 554-55, 84 S. Ct. 1362, 1377-78 (1964).[12] The Supreme Court has made it abundantly clear that "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S. Ct. 995, 1000 (citing *Evans v. Cornman*, 398 U.S. 419, 421-22, 426, 90 S. Ct. 1752, 1754-55, 1756 (1970); *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626-28, 89 S. Ct. 1886, 1889-90 (1969); *Cipriano v. City of Houma*, 395 U.S. 701, 706, 89 S. Ct. 1897, 1900 (1969); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 667, 86 S. Ct. 1079, 1081 (1966); *Carrington v. Rash*, 380 U.S. 89, 93-94, 85 S. Ct. 775, 778, 779 (1965); and *Reynolds*, 377 U.S. at 562, 84 S. Ct. at 1381). The right to participate in elections as protected by the Fourteenth Amendment includes the

---

[11] The Fifteenth Amendment protects against denial or abridgment of the right to vote "on account of race, color, or previous condition of servitude." U.S. CONST. amend. xv. The Voting Rights Act draws its constitutional authority from the Fifteenth Amendment. *See City of Rome v. United States*, 446 U.S. 156, 173, 100 S. Ct. 1548, 1559 (1980).

[12] "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote . . . . The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds*, 377 U.S. at 554-55, 84 S. Ct. at 1377-78.

right of a municipality's bona fide residents to vote in elections for municipal representatives. *See, e.g.*, **Carrington**, 380 U.S. at 94, 85 S. Ct. at 779.

On December 11, 1996, Kingwood was annexed by Houston. On January 18, 1997, Houston held an election in which Kingwood residents were not permitted to participate. The Kingwood residents' voting rights were thereby compromised. This impairment of the Kingwood residents' constitutional right to vote must be reviewed under the strict scrutiny standard. *See* **Kramer**, 395 U.S. at 626-27, 89 S. Ct. at 1889-90; *see generally* JOHN E. NOWAK & RONALD D. ROTUNDA, CONSTITUTIONAL LAW § 14.31 (4th ed. 1991). Strict scrutiny requires that the restriction of a constitutional right be justified by a narrowly tailored compelling state interest. *See, e.g.*, **Messer v. Meno**, 130 F.3d 130, 136 (5th Cir. 1997).

The City's position does not satisfy strict scrutiny. The City contends first that no fundamental right is implicated because no right to vote accrued until preclearance was obtained. Secondly, the City claims that it had no option but to conduct the election as it did because a special election to fill the vacancy on the City Council was required by state law, *see* TEX. LOC. GOV'T CODE ANN. § 26.045 (Vernon Supp. 1998), and the date of the election was regulated by state law, *see, e.g.*, TEX. ELEC. CODE ANN. § 41.001(a) (Vernon 1986). Furthermore, the City contends that under federal law, the Kingwood voters could not participate in an election prior to preclearance. *See* 42 U.S.C. § 1973c. The City could not get preclearance before taking final action on the

annexation, and it would not be practicable for the City to have attempted to time the annexation to allow for preclearance because the amount of time needed by Department of Justice varies. Finally, the City says it would have also been undesirable or impracticable to delay annexation or the effective date of annexation until after the election because the City's taxes are assessed based on the value of property holdings on January 1, and therefore the end of the year is the only practical time to annex territory.[13]  There is nothing which is "narrowly tailored" or "compelling" about the City's position.

### A.

The City's first point -- that voting rights are contingent upon preclearance -- is unconvincing because it implies that a fundamental constitutional right is limited by the operation of a federal statute protecting one aspect of that right.  The City's reliance on the Voting Rights Act is misplaced because Section 5 of the Voting Rights Act does not purport to affirmatively permit elections to take place with less than full participation by all eligible voters.[14]  The Act's prohibition on certain elections

---

[13]  My quarrel is not with the City's timing of the annexation so as to reap the maximum tax benefit, but rather with the City's subsequent refusal to accommodate the newly annexed residents' right to vote.

[14]  Section 5 provides, in pertinent part:

> Whenever a State or political subdivision . . . shall enact or seek to administer any . . . standard, practice, or procedure with respect to voting different from that in force or effect on

states that prior to preclearance, "no person shall be denied the right to vote for failure to comply" with some change in a political unit's voting process. 42 U.S.C. § 1973c. Though this language has been construed to prohibit newly annexed voters from participating in an election after annexation and before preclearance because of potential infringement upon the right to vote through vote dilution affecting those citizens who resided in the municipality prior to annexation, *see **Perkins v. Matthews***, 400 U.S. 379, 91 S. Ct. 431 (1971), the statute in no way requires proceeding with an election based on the old, pre-annexation boundaries and denying the voters in the newly-annexed area the right to vote. *See **Duncan v. Town of Blacksburg, Va.***, 364 F. Supp. 643, 647 (W.D. Va. 1973). This is evident both from the text of Section 5 and the hierarchical supremacy of Fourteenth Amendment-

___

November 1, 1964 . . . such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, and *unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure*: *Provided*, That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made.

42 U.S.C. § 1973c (emphasis supplied).

protected voting rights over Voting Rights Act-created voting rights.

**B.**

The City's second point is also unconvincing because it merely describes how the City painted itself into a corner and as a result denied the franchise to nearly 40,000 voters.

The City's contention that state law required the City to hold the election on January 18 is simply not true. John Peavy, the previous occupant of the open City Council seat, resigned on July 30, 1996, with his resignation to be effective upon the election and qualification of his successor. The next general election of the City was scheduled for November 1997, more than 270 days away, and therefore a special election was required to fill this vacancy.

With respect to filling the vacant seat on the City Council, the timing requirement of Local Government Code § 26.045 specified that "[t]he special election shall be held on an authorized uniform election date prescribed by the Election Code that occurs before the general election and *that allows enough time to hold the election in the manner required by law*."[15] The authorized uniform

---

[15]    The pertinent statute provides, in its entirety:

> If a vacancy occurs on the governing body of a municipality with a population of 1.5 million or more and more than 270 days remain before the date

of the next general election of members of the governing body, the governing body shall order a special election in the district in which the vacancy occurred, or in the entire municipality if the vacancy occurred in an at-large position, to fill the vacancy. The special election shall be held on an authorized uniform election date prescribed by the Election Code that occurs before the general

-27-

election dates are: "(1) the third Saturday in January; (2) the first Saturday in May; (3) the second Saturday in August; or (4) the first Tuesday after the first Monday in November." TEX. ELEC. CODE ANN. § 41.001(a) (Vernon 1986). The City has not explained to this Court why the special election could not have been held on the first Saturday in May following the annexation rather than the third Saturday in January, which was the date selected. The first Saturday in May would have allowed the full sixty days needed by the Department of Justice to act on the preclearance application from December 23, 1996, the date of its filing, and then an additional seventy-two days after preclearance to tend to the administrative details of the election.[16]

It should be noted that this Texas statute requires that the election be scheduled to allow "enough time to hold the election in the manner required by law." TEX. LOC. GOV'T CODE ANN. § 26.045 (Vernon Supp. 1998). Surely, the holding of elections "in the manner required by law" means not holding elections that violate the Constitution. *See* U.S. CONST. art. VI, § 2.

---

election and *that allows enough time to hold the election in the manner required by law* and shall be conducted in the same manner as the municipality's general election except as provided by provisions of the Election Code applicable to special elections to fill vacancies.

TEX. LOC. GOV'T CODE ANN. § 26.045 (Vernon Supp. 1998) (emphasis supplied).

[16]    Although I refer here and throughout this opinion to application to the Department of Justice for the preclearance required by § 5, the City also had the more time-consuming option of applying to the United States District Court for the District of Columbia. *See* 42 U.S.C. § 1973c.

There were two other issues on the ballot: limiting the City's taxing authority and raising the minimum wage in Houston. Both issues were placed on the ballot as a result of a signature drive in support of each referendum.[17] The sufficiency of the petition for each issue was verified by City Secretary Anna Russell on December 6, 1996.

The proposed limitation on taxing authority took the form of a charter amendment. With respect to the timing of referenda on charter amendments, Texas law provides:

> The ordinance ordering the election shall provide for the election to be held on the *first* authorized uniform election date prescribed by the Election Code or on the earlier of the date of the next municipal general election or presidential general election. *The election date must allow sufficient time to comply with other requirements of law and must occur on or after the 30th day after the date the ordinance is adopted.*

TEX. LOC. GOV'T ANN. § 9.004(b) (Vernon 1986) (emphasis supplied).

With respect to timing of the referendum on the proposed ordinance regarding minimum wages, the City Charter provides that once the issue had been certified,

> the council, within ten days after receipt thereof, except as otherwise provided in this Chapter, shall

---

[17] A campaign called Tax Vote '97 was organized for the purpose of forcing a referendum on a measure that would prohibit the City Council from raising taxes and certain fees without the permission of voters. The plan was announced on October 25, 1996. On November 12, a petition with over 20,000 signatures was presented to the City.

On October 8, 1996, the Living Wage campaign kicked off. The plan was to collect signatures to force a referendum on raising the minimum wage in Houston to $6.50 per hour. A petition with approximately 30,000 signatures was turned over to the City on November 6, 1997.

either pass such ordinance or resolution without alteration, or submit it to the popular vote at a special election, which must be held within thirty days after the date of the ordering thereof; provided, however, that if any other municipal election is to be held within sixty days after the filing of the petition said proposed ordinance or resolution shall be submitted without alteration to be voted upon at such election.

HOUSTON CITY CHARTER art. VIIb, § 2.

While the City contends that these referenda had to be considered on January 18, an examination of the controlling law shows this not to be the case. Just as in the case of electing a new at-large council member, with respect to the charter amendment Texas law requires that enough time be allowed "to comply with other requirements of the law." TEX. LOC. GOV'T CODE ANN. § 9.004(b) (Vernon 1986). As explained *supra*, the Constitution's protections of voting rights constitute requirements of law with which the City must comply. If Texas law did not provide this escape clause, it would be unconstitutional as applied in this case, where voting rights were infringed. And for that very reason, because the City Charter does not provide any apparent mechanism for accommodating external legal problems which may be encountered in the scheduling of certain elections, its Article VIIb, Section 2(c) is unconstitutional as applied in this case. Strict scrutiny applies to test the legality of the scheduling provision, and there certainly was no legitimate government interest in refusing to delay submission of the referenda until preclearance was obtained. Thus, the City was not empowered to proceed with these referenda

prior to preclearance because that action violated the Kingwood residents' constitutional rights.

## C.

It is apparent that once the annexation ordinance for Kingwood was passed finally on second reading on December 12, 1996, the City of Houston was faced with something of a Hobson's choice as to whether it should hold the election on January 18, 1997, which is the subject matter of this case. The law has been crystal clear since 1971 that

> Changing boundary lines by annexations which enlarge the city's number of eligible voters also constitutes the change of a "standard practice or procedure with respect to voting." Clearly revision of boundary lines has an effect on voting in two ways: (1) by including certain voters within the city and leaving others outside, it determines who may vote in the municipal election and who may not; (2) it dilutes the weight of the votes of the voters to whom the franchise was limited before the annexation, and the "right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of a franchise."

*Perkins*, 400 U.S. at 388, 91 S. Ct. at 437 (quoting *Reynolds*, 377 U.S. at 555, 84 S. Ct. at 1378). Consequently, the City certainly knew (or its legal counsel reasonably should have known) that the completion of annexation would produce the duty and responsibility on the part of the City to comply with the terms and provisions of Section 5 of the Voting Rights Act regarding preclearance of voting changes by the Department of Justice. The process of annexation of Kingwood officially began with the passage of the annexation ordinance on first reading on October 12, 1996. While it is true

-31-

that an application for preclearance cannot be submitted to the Department of Justice until final passage of the annexation ordinance, the City certainly knew (or its legal counsel should have known) that preclearance would ultimately be required before any election could be held which included the newly-annexed area. The special election on January 18, 1997 was obviously scheduled by the City during the time that the annexation process was being finalized, with clear awareness on the part of the City that final completion of the annexation process would undoubtedly occur before the end of December 1996 so that the annexation would be applicable for tax purposes as of the tax assessment date of January 1, 1997. Once the annexation ordinance was finally passed, the City had three choices.

First, the City could have changed the date of the then-scheduled special election from January 18, 1997 to May 3, 1997, thereby allowing sufficient time for preclearance by the Department of Justice to occur.  If the Department of Justice gave pre-clearance, the election would then have been held on May 3 with all residents of the City of Houston, including the residents of Kingwood, being permitted to vote.  On the other hand, if the Department of Justice refused preclearance, either the annexation could have been repealed and an election held based on pre-annexation boundaries, or the election could have been rescheduled for a later date to allow time for compliance with other mandates of the Department of Justice.

The second alternative was to proceed with the election as scheduled on January 18 and permit the newly-annexed residents of Kingwood to vote in that election. This alternative would put the City in technical noncompliance with the Voting Rights Act and would have given the minority plaintiffs in this case grounds for an injunction to stay the holding of such an election. *See, e.g.*, *Lopez v. Monterey County, Cal.*, 117 S. Ct. 340, 347 (1996). If the Department of Justice ultimately determined that the annexation met preclearance requirements, the injunction, if one had issued, would have been lifted, and the election would have been scheduled for a new date at which all the qualified voters in the City would have been permitted to vote. Or, if no injunction had been sought, the election which actually took place would have been validated because the Department of Justice did, in fact, ultimately preclear the annexation. *Cf.* **Perkins**, 400 U.S. at 396-97, 91 S. Ct. at 441. Under this scenario, if the Department of Justice had determined that the annexation could not satisfy the requirements of the Voting Rights Act, the injunction, if any, would have been continued in effect until the City took whatever action was mandated by the Department of Justice as being necessary to secure preclearance. If no injunction had issued, the election itself would have been subject to being declared invalid for noncompliance with the Voting Rights Act. *See* **id**.

The third alternative which the City might have chosen was the one which the City actually chose: holding the special election on January 18, but denying the right of the newly-annexed residents of

-33-

Kingwood to vote in the election. It is important to note that this denial of the right to vote was purely the idea of the City, which it implemented without valid authority. This unconstitutional course of action was not required by nor the result of any decision by the federal district court nor by the Department of Justice. There is nothing in the record in this case which shows when and who made the decision to deny the newly-annexed citizens of Kingwood the right to vote. The annexation ordinance itself says nothing about denying the right to vote to the citizen of the area to be annexed, and there is no other ordinance adopted by the City Council in this record which addresses this subject. And as was ultimately demonstrated by the grant of preclearance by the Department of Justice, there was, in fact, no grounds or basis for denying the voters of the newly-annexed Kingwood area to vote in this election. Had the City simply waited, Kingwood residents would have been able to participate. This error of judgment by the City of Houston can certainly not be categorized as harmless. There were 40,000 registered and qualified voters in the Kingwood area who could and should have been permitted to vote in this election.

Of the three foregoing options which the City had upon final passage of the annexation ordinance, the only one which permitted the City to simultaneously satisfy its obligations under the Voting Rights Act to seek preclearance and its obligations under the

Fourteenth Amendment and its own City Charter[18] to enforce the voting rights of its newly-annexed citizens was the first one described: postponing the then-scheduled special election from January 18, 1997 to May 3, 1997. There is nothing in this case which shows that the City had a "compelling" interest in holding the special election only on January 18, 1997. Good common sense and sound constitutional policy would require a governmental entity to recognize a rule that when it exercises the power of annexation, it has duties and obligations to both its existing citizens under the Voting Rights Act and its newly-annexed citizens under the Fourteenth Amendment. Those duties require a moratorium on the conduct of all elections during the period following the effective date of annexation until preclearance has been obtained in satisfaction of the Voting Rights Act. I regret that the "mootness" decision of my colleagues precludes this Court from addressing and adopting that rule.

**D.**

The City claims that the opinion of a three-judge court in *Dotson v. City of Indianola*, 514 F. Supp. 397 (1981), gives it authority to deny the right to vote to the new Kingwood residents.

---

[18]     *See* HOUSTON CITY CHARTER art. I, § 2b ("[W]hen such ordinance [providing for the extension of the boundary limits of the City of Houston] is finally passed the said territory so annexed shall be a part of the City of Houston, and *the inhabitants thereof shall be entitled to all the rights and privileges of other citizens . . . .* (emphasis supplied)).

In my view, the reliance of the City on the language in **Dotson** is completely misplaced.

The facts in **Dotson** are very straightforward. In May 1965, May 1966, September 1966, and July 1967, the City of Indianola completed annexations of various areas of land to its boundaries. Each of these annexations added new eligible voters to the electoral base for Indianola. Indianola conceded that it had never obtained preclearance of any of these annexations as required by Section 5. Indianola implemented and relied upon these annexations in the municipal elections conducted in 1968, 1969, 1973, and 1977. In each of these elections persons residing in the newly-annexed areas participated both as voters and candidates.

In October 1975, the Assistant United States Attorney General for the Civil Rights Division initiated correspondence with the attorney for Indianola, notifying the city that these annexations required preclearance under Section 5. The city was requested to submit the necessary documentations for the Attorney General to review these annexations. The City of Indianola essentially never responded to these requests.

In August 1980, the Department of Justice again wrote to the city attorney, asking for the previously requested additional information. In October 1980, Nelson Dotson and other black adult citizens, residents, and qualified voters brought an action seeking declaratory and injunctive relief against the mayor and aldermen of Indianola because the four annexations to the corporate limits of Indianola which had occurred in 1965-67 had never been precleared.

The plaintiffs sought an order setting aside the 1977 municipal elections and scheduling a special election to choose new city officials. At the time of the *Dotson* opinion, the incumbent mayor and aldermen had been elected in 1977, and four of the five aldermen resided in the annexed areas.

During consideration of this matter by the three-judge court, the city attorney for Indianola represented to the court "that all the requested preclearance information ha[d] been submitted to the Attorney General of the United States as of May 1, 1981." While the three-judge court declined to void the 1977 elections and call a special election because the general election for these offices would "be conducted November 8 and December 10 of th[at] year," it did issue the following statement as prospective injunctive relief:

> However, Indianola cannot continue to hold elections based upon uncleared post-annexation city limits. Unless and until the City obtains clearance of its post-Act annexations in accordance with Section 5, all future elections must be conducted on the basis of the city boundaries as they existed before the unprecleared annexations were made, and citizens residing in such annexed areas may not participate in future municipal elections, either as electors or as candidates.

*Dotson*, 514 F. Supp. at 403. It is this quoted language upon which the City of Houston relies.

For the City of Houston to now extrapolate from the quoted language in *Dotson* a general rule authorizing it to deny unilaterally the voters of the newly-annexed Kingwood area the right to vote is, in my humble opinion, preposterous. The quoted language cannot qualify as a holding with precedential value in this case. The jurisdiction of a three-judge court convened to

-37-

address a claimed violation of Section 5 of the Voting Rights Act is extremely limited. Essentially, the district court panel hearing a Section 5 challenge is charged with determining whether the action taken and complained of by the plaintiffs constitutes a voting change within the meaning of Section 5; if it does, the court must then determine whether that change has received preclearance under the terms of Section 5. *See* **Perkins**, 400 U.S. at 383-84, 91 S. Ct. at 434. If the answer to the first question is yes and the second question is no, the three-judge panel has jurisdiction to give the plaintiffs such temporary relief as may be necessary to allow for the preclearance review. *See, e.g.*, **id**. at 396-97, 91 S. Ct. at 441. Given this narrow and limited jurisdiction, the precedential value of the precatory statement by the **Dotson** panel as to the rights of "citizens residing in such annexed areas" seems greatly diminished to me. This case concerns the voting rights of newly-annexed citizens who were disenfranchised when they were excluded from participation in an election. That issue was not before the three-judge court convened in **Dotson**, nor was it before the three-judge court previously convened in this litigation.[19]

---

[19] Moreover, the distinctions between the two cases are legion. In **Dotson** the newly-annexed areas had been permitted to vote; in the present case, the newly-annexed areas were denied the right to vote by the City itself. In **Dotson**, the city never attempted to secure preclearance until after the lawsuit was actually before the court some thirteen years later; here, the City filed preclearance papers shortly after the final annexation vote, and the preclearance process was underway at the time the plaintiffs asked for injunctive relief. In **Dotson** the elections in question were regularly scheduled primary and general elections; in this case, the election in question was a special election, the

-38-

**E.**

The City's decision to hold the January 18 special election violated both the United States Constitution and the City's own charter. Faced with the choices of disenfranchising the Kingwood residents or rescheduling the special election, the City chose to deny 40,000 newly-annexed residents their right to vote.

The only way the City could prevail on the issue of the denial of the Kingwood residents' voting rights would be to show some sufficiently compelling and narrowly tailored government interest. The inconvenience of rescheduling the election does not meet this high standard. With respect to the requirements of state law, I would hold that the City's conduct does not satisfy strict scrutiny, given the statutory options available to avoid this result. To the extent that the City Charter may be construed to have required that the referendum on the proposed increase in the minimum wage take place prior to preclearance of the City's new boundaries, it is unconstitutional as applied. I would therefore conclude that John Harris, the Kingwood resident who sought to vote

---

timing of which was subject to various options under the statutes. In **Dotson** four of the five city aldermen resided in the areas which had been annexed without preclearance; in our case, neither the mayor nor any City Council member resided in Kingwood. In **Dotson** there was a demonstrated history of non-compliance with the Voting Rights Act; there is no evidence whatsoever that the City of Houston had a history of non-compliance. Finally, and most significantly, there is nothing in the **Dotson** opinion which would indicate that the plaintiffs in that case were contesting the validity of the annexations themselves, nor that the plaintiffs in **Dotson** were asserting any claim or right under the Fourteenth Amendment as distinguished from their claims under the Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq.*, which derives its authority from the Fifteenth Amendment.

and run for office in the January 18 special election, has proved a violation of constitutional magnitude. I would reverse this aspect of the district court's judgment and remand to the district court so that an appropriate remedy could be fashioned.

### III.

The remaining claims in this case, raised by the utility district plaintiffs, concern the City's power to annex Kingwood.[20] The merits of these claims need not be closely examined because the issue presented to the Court on appeal is whether or not the plaintiffs have standing to bring the claims, and thus whether or not they were properly dismissed below. The district court initially declined to address these claims, noting that the state-law issues raised would not render annexation void ab initio, and therefore the claims must be brought in the name of the state in a quo warranto[21] proceeding. The state-law claims were subsequently dismissed.

It has been firmly established by a line of Texas Supreme Court precedent that "[t]he only proper method for attacking the validity of a city's annexation of territory is by *quo warranto*

---

[20] The minority plaintiffs below alleged voting rights violations under the Fourteenth and Fifteenth Amendments and § 2 of the Voting Rights Act. These plaintiffs did not appeal from the judgments below, and therefore their claims are not before our Court.

[21] Literally, "by what authority." BLACK'S LAW DICTIONARY, *supra*, at 1256. "The purpose of a *quo warranto* proceeding is to question the right of a person or corporation, including a municipality, to exercise a public franchise or office." ***Alexander Oil Co. v. City of Seguin***, 825 S.W.2d 434, 436-37 (Tex. 1991).

proceeding, unless the annexation is wholly void." ***Alexander Oil***

***Co. v. City of Seguin***, 825 S.W.2d 434, 436 (Tex. 1991) (citing

***Hoffman v. Elliott***, 476 S.W.2d 845, 846 (Tex. 1972) (per curiam);

***Graham v. City of Greenville***, 67 Tex. 62, 68, 2 S.W. 742, 745

(1886); ***Kuhn v. City of Yoakum***, 6 S.W.2d 91, 91 (Tex. Comm'n App.

1928, judgm't adopted)).

The Texas Supreme Court compiled the following compendium of circumstances in which an annexation had been held void rather than merely voidable:

> Historically, private challenges of annexation ordinances have been sustained and the ordinance held void in the following instances: an annexation of territory exceeding the statutory size limitations; an attempted annexation of territory within the corporate limits of another municipality or which was not contiguous with its own limits; an attempted annexation in which the boundary of the annexed territory did not close using the description contained in the ordinance. The common trait in these cases is whether the municipality exceeded the annexation authority delegated to it by the Legislature. The power to annex is committed to the political branches of state government; it is a legislative prerogative.

***Id.*** at 438 (citations omitted). The violations alleged by the plaintiffs do not suggest that this annexation was completely beyond the bounds of the annexation authority granted by the state.

The plaintiffs allege the following irregularities: failure to negotiate a strategic partnership agreement with the districts (TEX. LOC. GOV'T CODE ANN. § 43.0751(b) (Vernon Supp. 1998)); annexation before September 1, 1997 ((TEX. LOC. GOV'T CODE ANN. § 43.0751(m) (Vernon Supp. 1998)); and failure to provide an adequate service plan (TEX. LOC. GOV'T CODE ANN. § 43.056(a), (g)

-41-

(Vernon Supp. 1998)).  None of these allegations strike the city's fundamental authority to annex Kingwood.  They merely point to questions of procedure -- when or how to annex, but not if the City could annex.

Each of the utility district plaintiffs' allegations is the proper subject of a quo warranto proceeding.  The district court's initial reaction is certainly correct, and the state law claims were properly dismissed.

## IV.

This case is not moot.  I respectfully dissent from my colleagues' opposite conclusion.  On the merits, I would conclude that the right of Plaintiff John Harris and the other Kingwood residents to vote and participate in the January 18 special election was violated.  The right to vote is truly fundamental, and therefore the decision of the City of Houston to hold an election during the period between annexation and preclearance and to deny the residents of Kingwood the right to vote at such election constituted a violation of the Kingwood residents' constitutional rights.

I would, therefore, reverse the judgment of the district court which denied relief to Plaintiff John Harris, and I would remand that portion of this case to the district court for the fashioning of appropriate declaratory or injunctive relief.

The other plaintiffs' complaints are meritless, and I would, therefore, affirm the district court's denial of relief as to all plaintiffs other than Harris.